## PHILADELPHIA AND SOUTHERN STEAMSHIP COMPANY *v.* PENNSYLVANIA.

ERROR TO THE SUPREME COURT OF THE STATE OF PENNSYLVANIA.

Argued April 7, 1887. — Decided May 27, 1887.

A state tax upon the gross receipts of a steamship company incorporated under its laws, which are derived from the transportation of persons and property by sea, between different states, and to and from foreign countries, is a regulation of interstate and foreign commerce, in conflict with the exclusive powers of Congress under the Constitution.

*State Tax on Railway Gross Receipts,* 15 Wall. 284, considered and questioned.

THE question in this case was, whether a state can constitutionally impose upon a steamship company, incorporated under its laws, a tax upon the gross receipts of such company derived from the transportation of persons and property by sea, between different states, and to and from foreign countries.

By an act of the legislature of Pennsylvania, passed March 20, 1877, it was, amongst other things, enacted as follows, to wit:

" That every railroad company, canal company, steamboat company, slack-water navigation company, transportation company, street passenger railway company, and every other company now or hereafter incorporated by or under any law of this commonwealth, or now or hereafter incorporated by any

other state, and doing business in this commonwealth, and owning, operating, or leasing to or from another corporation or company any railroad, canal, slack-water navigation, or street passenger railway, or other device for the transportation of freight or passengers, or in any way engaged in the business of transporting freight or passengers, and every telegraph company incorporated under the laws of this or any other state, and doing business in this commonwealth, and every express company, and any palace-car and sleeping-car company, incorporated or unincorporated, doing business in this commonwealth, shall pay to the state treasurer, for the use of the commonwealth, a tax of eight tenths of one per centum upon the gross receipts of said company for tolls and transportation, telegraph business, or express business."

A similar act was passed by the same legislature on the 7th of June, 1879.

By the terms of these acts, returns of the gross receipts are required to be made every six months to the Auditor General, upon which the tax is assessed by him and charged against the company.

Under and by virt  of these acts, the Auditor General of the state, in October, 1882, charge l the appellant, The Philadelphia and Southern Mail Steamship Company, taxes upon its gross receipts for the years 1877, 1878, 1879, 1880, and 1881, all of which receipts were derived from freight and passage money between the ports of Philadelphia and Savannah, and in foreign trade from New Orleans, and a small amount for charter parties in the like trade. The tax thus charged against the company for the five years in question amounted to about $6500, and, with accumulated interest and penalties, to over $9000. After serving the account upon the company, an action was brought for its recovery in the Common Pleas of Dauphin County, at Harrisburg. The defendant pleaded that it was a steamship company, "operating sea-going steamships engaged in the business of ocean transportation between different states of the United States and between the United States and foreign countries, and that all the said steamships of the said defendant were duly enrolled or registered under

the laws of the United States for the coasting or foreign trade of the United States, and that the gross receipts so returned to the Auditor General, upon which a tax had been levied by the Commonwealth of Pennsylvania, were received by defendants for freight and passengers carried in the said steamships on the ocean and on the navigable waters of the United States, between the state of Pennsylvania and other states of the United States, and between the states of the United States and foreign countries, and for the charter and hire of the said steamships to other parties in such trade and business, and that no part of the said gross receipts was received for the transportation of freight and passengers between places within the state of Pennsylvania, or for the hire and use of the said steamships within the state of Pennsylvania."

On the trial of the cause the parties entered into an agreement as to the facts, showing the gross receipts for each year, in each branch of the company's trade; which facts supported the allegations of the plea. A trial by jury was dispensed with, and the court gave judgment for the commonwealth for the principal of the tax and interest from the time of commencing suit. Exceptions were taken on the ground that the judgment was in conflict with the clause of the Constitution of the United States giving to Congress the power to regulate commerce with foreign nations and among the several states. The judgment being removed by writ of error to the Supreme Court of Pennsylvania, was affirmed by that court; and its judgment was brought before this court for review by writ of error.

*Mr. Morton P. Henry* for plaintiff in error.

*Mr. W. S. Kirkpatrick*, Attorney General of Pennsylvania, for defendant in error. *Mr. John F. Sanderson*, Deputy Attorney General of the State, was with him on the brief.

The relation of the corporation to the state certainly affects the question at issue. If a domestic corporation, it is the creature of the state, a resident of the same, and deriving its privileges from such state. A foreign corporation deriving its

franchises from extra-territorial authority is not subject to taxation thereon, and is only taxable as to its property whose *situs* is within the limits of the taxing state. The tax in question is sustainable upon the assumption that it is a tax upon the franchises of the corporation, such corporation being the creature of the taxing power, having its principal place of business within the limits of the state creating it, and its franchises being a valuable interest, property or commodity subject to taxation. *Portland Bank* v. *Apthorp*, 12 Mass. 252; *Commonwealth* v. *Peoples' Five Per Cent Bank*, 5 Allen, 431; *Savings Bank* v. *Coit*, 6 Wall. 606; *Provident Institution* v. *Massachusetts*, 6 Wall. 623.

The right of a corporation to exist and exercise the powers vested in it by its charter is called its franchise. Burroughs on Taxation, p. 164, § 85. In *The Delaware Railroad Tax Case*, 18 Wall. 206, it was decided that a tax may be imposed upon a corporation itself, measured by an arbitrary rule. It was there held that a tax may be imposed by a state upon a corporation as an entity existing under its laws, as well as upon the capital stock of the corporation or its separate corporate property. And the manner in which its value is assessed, and the rule of taxation, however arbitrary or capricious, are mere matters of legislative discretion: that a tax upon a corporation may be graduated upon income received, as well as the value of the franchises granted or the property possessed. And that the exercise of the authority which every state possesses to tax its corporations and their property and their franchises, and to graduate the tax upon the corporations according to their business or income or the value of their property, when this is not done by discriminating against rights held in other states, and the tax is not on imports or tonnage, or transportation to other states, cannot be regarded as conflicting with any constitutional power of Congress. The fact that the corporation, plaintiff in error, uses vessels and navigates the natural highways of the country, makes it no less liable to a corporation tax than if it were a railroad company, nor does it affect our position, that the taxation may indirectly or ultimately affect the commerce carried on, or the instrument used therein.

Cooley on Taxation, 61; *Howell* v. *Maryland*, 3 Gill, 14; *Morgan* v. *Parham*, 16 Wall. 476; *Transportation Co.* v. *Wheeling*, 99 U. S. 273.

The steamship company in the present case is a corporation of Pennsylvania, receiving from that state its corporate existence and franchises, and in contemplation of law it is a citizen and inhabitant of that state. Its franchises, as we have already shown, are property subject to taxation. The employment of its vessels in trade, along the coast and with foreign ports, does not take away the liability of the franchises of the corporation to be taxed where that property is regarded as situated any more than the employment of its vessels outside of the limits of the state would deprive that state of the power to tax them as another species of personal property of the same owner. The corporation owns vessels and it owns its franchises as a corporation. These are two kinds of personal property, and each is taxed as such without regard to the fact that it is involved in and devoted to the pursuit of interstate and foreign commerce. Indeed, the corporation may be taxed as such in consideration of its receiving its corporate existence and privileges, and as possessing therein an interest, or item of property, and there would be even a less direct interference with its operations in commerce than in the taxation of its vessels.

The mistake of the opposing counsel is that he fails to observe the distinction between a franchise or privilege to sail a ship or engage in commerce by the employment of any of its usual instrumentalities, and the franchise or liberty to sail ships or engage in commerce as a corporate body.

The right to navigate the seas is a natural right, just as is the right to travel upon land in carriages, stages, or by foot, and to carry packages and merchandise for hire. Both are subject to regulation. In the first case the Federal government exercises the right to regulate for the purpose of conserving and controlling this right, as also it has recently done, to some extent, in the case of railroad carriage in the enactment of the interstate commerce bill.

The power of the state to tax in the one case is no more taken away than it is in the other.

We fail to see the difference between the case of vessels plying upon the navigable waters of the United States and a railroad company operating over an artificial highway for the purposes of the present argument. If there is, and steamship companies are exempt for that reason from taxation upon their franchises, then an express company, or messenger company, or stage coach company would be exempt for the same reason if their business embraced interstate traffic; for they, as 'in the case of vessel owners, use the natural or artificial highways of the country already at hand, and which all may use. The use of a public road or a river by travellers engaged in business, or in pursuit of recreation, is in all essential respects the same. The mere accident that one is solid and the other liquid, does not affect the similarity of conditions in respect to the question now before us.

The case of the *State Tax on Railway Gross Receipts*, 15 Wall. 284, clearly controls and rules the present case. The fact that it was a railroad company is only an incidental and non-essential difference, as will readily be seen by a mere reading of the case. It was there held that the tax in question being under a statute in all material respects identical with the present one, and intended to embrace all transportation companies, was a tax upon the corporation, measured by the fruits of its business, as ascertained after they were mingled with its property in the possession of the company, and at intervals of six months.

It is better to quote from the opinion than to attempt to give its substance in order to develop the true ground upon which it was based.

This court there said, with reference to the question as to whether the tax in controversy was an invasion upon the Federal power to regulate commerce, " The answer which must be given to it depends upon the prior question whether a tax upon gross receipts of a transportation company is a tax upon commerce so far as that commerce consists in moving goods or passengers across state lines. No doubt every tax upon personal property or upon occupations, business or franchises, affects, more or less, the subjects and the operations of

commerce. Yet it is not everything that affects commerce
that amounts to a regulation of it, within the meaning of the
Constitution. We think it may safely be asserted that the
states have authority to tax the estate, real and personal, of
all their corporations, including carrying companies, precisely
as they may tax similar property when belonging to natural
persons, and to the same extent. We think, also, that such
taxation may be laid upon a valuation, or may be an excise,
and that in exacting an excise tax from their corporations the
states are not obliged to impose a fixed sum upon the fran-
chises, or upon the value of them, but they may demand a
graduated contribution, proportioned either to the value of
the privilege granted, or to the extent of their exercise, or to
the results of such exercise. No mode of effecting this, and no
forms of expression which have not a meaning beyond this,
can be regarded as violating the Constitution." Then, after
adverting to the distinction between tax on freight, or the
price of transportation, and tax upon gross receipts, ascertained
at semiannual periods, after they have come into the posses-
sion of the company, and showing that such tax in the latter
is not upon commerce, but upon a subject which has lost its
distinctive character as freight and become mingled with the
property of the corporation,-the court thereby shows that it is
practically upon the fruits of the business, and not upon the
business itself. It is not necessary to determine whether the
court meant to place this part of its opinion upon the idea of
its being a property tax, or as an argument to show that the
basis of the taxation was analogous to such tax, and that such
basis was withdrawn from the conditions of a tax upon freight.
The court finally goes on to say, however: "It is not to be
questioned, however, that the states may tax the franchises of
companies created by them, and that the tax may be propor-
tioned either to the value of a franchise granted or to the ex-
tent of its exercise; nor is it deniable that gross receipts may be
a measure of proximate value, or if not, at least of the extent
of the enjoyment. If the tax be, in fact, laid upon the compa-
nies adopting such a measure, it imposes no greater burden upon
any freight or business from which the receipts came than would

be an equal tax laid upon a direct valuation of the franchise. In both cases the necessity of higher charges to meet the exaction is the same."

Commerce over the railroads of the country is just as much commerce within the meaning of the Constitution as commerce over the water ways. The question to be determined is not whether commerce is affected, but whether it is controlled or operated upon directly by the taxing power. The character of the highway cannot determine this question, nor can it depend upon whether the traffic is carried on by a boat or a car. If the taxation is upon the tonnage or freights or fares, it is an interference with the commercial power. If it be taxation upon a valuation of the fruits of the business after they have become mingled with its property, it is not obnoxious to the Federal prohibition.

In the present case the greater part of the trade was between the cities of Philadelphia and Savannah. Now, suppose the same trade, involving precisely the same merchandise, had been carried on by means of railway cars between the same points, it would unquestionably have been within the ruling of the *Railway Gross Receipts Case.* Surely it cannot be successfully contended that because it was carried in a ship instead of a railway car a different principle will be applied, and that for that reason alone it is not governed by the last cited case. The inconsequential character of such an argument will more forcibly appear when it is remembered that the ship itself may be taxed as personal property.

The case of *Railroad Company* v. *Maryland*, 21 Wall. 456, does not justify the use made of it by the other side.

It must be borne in mind that in that case the right claimed by the state was to take and receive from the company, which was conceded as having been largely devoted to interstate travel, one-fifth of the total amount received for the transportation of passengers under a stipulation in its charter received from the state of Maryland, and which was a condition of its corporate existence. For the privilege of being endowed with the right of eminent domain and the power to construct a work which the state itself might build, the corporation as a

part of its charter agreed to give to the state a part of what the state might have wholly reserved. The state gave up its power to construct the highway itself to the corporation, and as a price therefor reserved a portion of the tolls which it might have earned for itself if it had itself commenced and operated the railroad. The opinion of Judge Bradley is with reference to this aspect of the case, and the remarks as to the difference between artificial highways such as railroads, and natural highways such as rivers and seas, were evidently with reference to the fact that the state had delegated a part of its power to construct, control, and reap profits from an artificial highway, reserving a part of the profit to itself. There is nothing in that case that can be construed into a departure from the case of the *Railway Gross Receipts* or as laying down the doctrine that the right of the state to tax a corporation or its franchises generally upon the basis of the gross receipts is limited to the case of railroad companies or companies having the power to construct and operate an artificial highway.

The *Railway Gross Receipts Case* and the present case are both under a general statute imposing a tax upon transportation companies generally. They are both alike cases of taxation upon the franchises of carrying companies according to a certain measurement, and therefore the remarks of Judge Bradley in the case in 21 Wallace would not be directly applicable here.

The cases of *Grover & Baker Sewing Machine Co.* v. *Butler*, 53 Ind. 454; *Shook* v. *Singer Manufacturing Co.*, 61 Ind. 520, and *Ex parte Robinson*, 2 Bissell, 309, are clearly not applicable.

The present case is not in any way analogous to the case of an attempt to restrain, limit, or regulate the transaction of business in manufacturing and selling patents. It may be even conceded that the imposition of conditions and restrictions upon corporations exercising such business would not be valid, without in any way affecting our present contention.

Granted that the right to navigate the navigable waters of the United States is free to all, subject only to the regula-

tions imposed by the navigation laws, the right to tax the property or franchises is not a restraint, condition, or limitation on the operations or business of navigating any more than such tax is a limitation on the operation of, or carriage upon, a train of railway cars. Any restriction or limitation, such as requiring a license or enrolment, or payment of port fees for the privilege of passing through the harbors, rivers, or other waters of a state would be an analogous case, and these requirements of course could not be sustained. That a tax might indirectly affect the commerce in question, by increasing its burdens or rates, is, as shown in the cases cited, no valid objection to its collection, and therefore, for that reason, could not be an objection in the present case.

This would be so even if the United States conferred the right of navigation instead of merely licensing and regulating it.

Whether, therefore, the *Railway Gross Receipts Case* and others which have followed and accepted its conclusions, be regarded as sustaining such a tax upon the corporation franchises whose value is measured thereby, or upon such receipts as property received into its possession, the right of taxation in the present case may be regarded as having been thereby finally settled. To refuse to sustain the right of taxation upon the gross receipts of steamship companies would necessitate a direct overruling of the solemn adjudications of this court, for there is no rational distinction which can be drawn to take this case out of the operation of the principles heretofore announced.

Mr. JUSTICE BRADLEY, after stating the case as above reported, delivered the opinion of the court.

The question which underlies the immediate question in the case is, whether the imposition of the tax upon the steamship company's receipts amounted to a regulation of or an interference with, interstate and foreign commerce, and was thus in conflict with the power granted by the Constitution to Congress? The tax was levied directly upon the receipts derived

by the company from its fares and freights for the transportation of persons and goods between different states, and between the states and foreign countries, and from the charter of its vessels which was for the same purpose. This transportation was an act of interstate and foreign commerce. It was the carrying on of such commerce. It was that, and nothing else. In view of the decisions of this court, it cannot be pretended that the state could constitutionally regulate or interfere with that commerce itself. But taxing is one of the forms of regulation. It is one of the principal forms. Taxing the transportation, either by its tonnage, or its distance, or by the number of trips performed, or in any other way, would certainly be a regulation of the commerce, a restriction upon it, a burden upon it. Clearly this could not be done by the state without interfering with the power of Congress. Foreign commerce has been fully regulated by Congress, and any regulations imposed by the states upon that branch of commerce would be a palpable interference. If Congress has not made any express regulations with regard to interstate commerce, its inaction, as we have often held, is equivalent to a declaration that it shall be free, in all cases where its power is exclusive; and its power is necessarily exclusive whenever the subject matter is national in its character and properly admits of only one uniform system. See the cases collected in *Robbins* v. *Shelby Taxing District*, 120 U. S. 489, 492, 493. Interstate commerce carried on by ships on the sea is surely of this character.

If, then, the commerce carried on by the plaintiff in error in this case could not be constitutionally taxed by the state, could the fares and freights received for transportation in carrying on that commerce be constitutionally taxed? If the state cannot tax the transportation, may it, nevertheless, tax the fares and freights received therefor? Where is the difference? Looking at the substance of things, and not at mere forms, it is very difficult to see any difference. The one thing seems to be tantamount to the other. It would seem to be rather metaphysics than plain logic for the state officials to say to the company: "We will not tax you for the transportation you

perform, but we will tax you for what you get for performing it." Such a position can hardly be said to be based on a sound method of reasoning.

This court did not so reason in the case of *Brown* v. *Maryland*, 12 Wheat. 419. The state of Maryland required all importers of foreign goods and other persons, selling the same by wholesale, bale or package, to take out a license and pay $50 therefor, subject to a penalty and forfeiture for selling without such license. It was contended on the part of the state that this was a mere tax on the occupatio' of selling foreign goods, affecting only the person and not the importation of the goods themselves, or the occupation of importing them. Chief Justice Marshall met this objection by showing that the attempt to regulate the sale of imported goods was as much in conflict with the power of Congress to regulate commerce as a regulation of their importation itself would be. "If this power," said he, (referring to the power of Congress,) "reaches the interior of a state, and may be there exercised, it must be capable of authorizing the sale of those articles which it introduces. Commerce is intercourse : one of its most ordinary ingredients is traffic. It is inconceivable that the power to authorize this traffic, when given in the most comprehensive terms, with the intent that its efficacy should be complete, should cease at the point when its continuance is indispensable to its value. To what purpose should the power to allow importation be given, unaccompanied with the power to authorize a sale of the thing imported? Sale is the object of importation, and is an essential ingredient of that intercourse, of which importation constitutes a part. It is as essential an ingredient, as indispensable to the existence of the entire thing, then, as importation itself. It must be considered as a component part of the power to regulate commerce. Congress has a right, not only to authorize importation, but to authorize the importer to sell. . . . Any penalty inflicted on the importer for selling the article in his character of importer must be in opposition to the act of Congress which authorizes importation. . . . The distinction between a tax on the thing imported, and on the person of the importer, can have

no influence on this part of the subject. It is too obvious for controversy that they interfere equally with the power to regulate commerce." pp. 446–448.

The application of this reasoning to the case in hand is obvious. Of what use would it be to the ship-owner, in carrying on interstate and foreign commerce, to have the right of transporting persons and goods free from state interference, if he had not the equal right to charge for such transportation without such interference? The very object of his engaging in transportation is to receive pay for it. If the regulation of the transportation belongs to the power of Congress to regulate commerce, the regulation of fares and freights receivable for such transportation must equally belong to that power; and any burdens imposed by the state on such receipts must be in conflict with it. To apply the language of Chief Justice Marshall, fares and freights for transportation in carrying on interstate or foreign commerce are as much essential ingredients of that commerce as transportation itself.

It is necessary, however, that we should examine what bearing the cases of the *State Freight Tax* and *Railway Gross Receipts*, reported in 15th of Wallace, have upon the question in hand. These cases were much quoted in argument, and the latter was confidently relied on by the counsel of the Commonwealth. They both arose under certain tax laws of Pennsylvania. The first, which is reported under the title of *Case of the State Freight Tax*, 15 Wall. 232, was that of the Reading Railroad Company, and arose under an act passed in 1864, which imposed upon every railroad, steamboat, canal and slack-water navigation company a tax of a certain rate per ton on every ton of freight carried by or upon the works of said company; with a proviso directing, in substance, that every company, foreign or domestic, whose line extended partly in Pennsylvania, and partly in another state, should pay for the freight carried over that portion of its line in Pennsylvania the same as if its whole line were in that state. Under this law the Reading Railroad Company was charged a tax of $38,000 for freight transported to points within Pennsylvania, and of $46,000 for that exported to points without the state.

The latter sum the company refused to pay; and the question in this court was, whether that portion of the tax was constitutional; and we held that it was not. Mr. Justice Strong delivered the opinion of the court. It was held that this was not a tax upon the franchises of the companies, or upon their property, or upon their business, measured by the number of tons of freight carried; but was a tax upon the freight carried, and because of its carriage: that transportation is a constituent of commerce: that the tax was, therefore, a regulation of commerce, and a regulation of commerce among the states: that the transportation of passengers or merchandise from one state to another is, in its nature, a matter of national importance, admitting of a uniform system or plan of regulation, and therefore, under the rule established by *Cooley* v. *The Port Wardens*, 12 How. 299, exclusively subject to the legislation of Congress. The inevitable conclusion was, that the tax then in question was in conflict with the exclusive power of Congress to regulate commerce among the states, and was, therefore, unconstitutional. Referring to the decision in *Crandall* v. *Nevada*, 6 Wall. 35, in which this court had decided that a state cannot tax persons for passing through or out of it, Justice Strong said: "If state taxation of persons passing from one state to another, or a state tax upon interstate transportation of passengers, is unconstitutional, *a fortiori*, if possible, is a state tax upon the carriage of merchandise from state to state in conflict with the Federal Constitution. Merchandise is the subject of commerce. Transportation is essential to commerce; and every burden laid upon it is *pro tanto* a restriction. Whatever, therefore, may be the true doctrine respecting the exclusiveness of the power vested in Congress to regulate commerce among the states, we regard it as established that no state can impose a tax upon freight transported from state to state, or upon the transporter because of such transportation."

The court in its opinion took notice of the fact that the law was general in its terms, making no distinction between freight transported wholly within the state and that which was destined to, or came from, another state. But it was held

that this made no difference. The law might be valid as to one class, and unconstitutional as to the other. On this subject Justice Strong said: "The state may tax its internal commerce, but if an act to tax interstate or foreign commerce is unconstitutional, it is not cured by including in its provisions subjects within the jurisdiction of the state. Nor is a rule prescribed for carriage of goods through, out of, or into a state, any the less a regulation of transportation because the same rule may be applied to carriage which is wholly internal." This last observation meets the argument that might be made in the present case, namely, that the law is general in its terms, and taxes receipts for all transportation alike, making no discrimination against receipts for interstate or foreign transportation, and hence cannot be regarded as a special tax on the latter. The decision in the case cited shows that this does not relieve the tax from its objectionable character.

If this case stood alone, we should have no hesitation in saying that it would entirely govern the one before us; for, as before said, a tax upon fares and freights received for transportation is virtually a tax upon the transportation itself. But at the same time that the *Case of State Freight Tax* was decided, the other case referred to, namely, that of *State Tax on Railway Gross Receipts*, was also decided, and the opinion was delivered by the same member of the court, 15 Wall. 284. This was also a case of a tax imposed upon the Reading Railroad Company. It arose under another act of Assembly of Pennsylvania, passed in February, 1866, by which it was enacted that "in addition to the taxes now provided by law, every railroad, canal and transportation company incorporated under the laws of this commonwealth, and not liable to the tax upon income under existing laws, shall pay to the commonwealth a tax of three-fourths of one per centum upon the gross receipts of said company; the said tax shall be paid semiannually." Under this statute the accounting officers of Pennsylvania stated an account against the Reading Railroad Company for tax on gross receipts of the company for the half year ending December 31, 1867. These receipts were derived partly from the freight of goods transported wholly within

the state, and partly from the freight of goods exported to points without the state, which latter were discriminated from the former in the reports made by the company. It was the tax on the latter receipts which formed the subject of controversy. The same line of argument was taken at the bar as in the other case. This court, however, held the tax to be constitutional. The grounds on which the opinion was based, in order to distinguish this case from the preceding one, were two : first, that the tax, being collectible only once in six months, was laid upon a fund which had become the property of the company, mingled with its other property, and incorporated into the general mass of its property, possibly expended in improvements, or otherwise invested. The case is likened, in the opinion, to that of taxing goods which have been imported, after their original packages have been broken, and after they have been mixed with the mass of property in the country, which, it was said, are conceded in *Brown* v. *Maryland* to be taxable.

This reasoning seems to have much force. But is the analogy to the case of imported goods as perfect as is suggested ? When the latter become mingled with the general mass of property in the state, they are not followed and singled out for taxation as imported goods, and by reason of their being imported. If they were, the tax would be as unconstitutional as if imposed upon them whilst in the original packages. When mingled with the general mass of property in the state they are taxed in the same manner as other property possessed by its citizens, without discrimination or partiality. We held in *Welton* v. *Missouri*, 91 U. S. 275, that goods brought into a state for sale, though they thereby become a part of the mass of its property, cannot be taxed by reason of their being introduced into the state, or because they are the products of another state. To tax them as such was expressly held to be unconstitutional. The tax in the present case is laid upon the gross receipts for transportation as such. Those receipts are followed and caused to be accounted for by the company, dollar for dollar. It is those specific receipts, or the amount thereof, (which is the same thing,) for which the com-

pany is called upon to pay the tax. They are taxed not only because they are money, or its value, but because they were received for transportation. No doubt a ship-owner, like any other citizen, may be personally taxed for the amount of his property or estate, without regard to the source from which it was derived, whether from commerce, or banking, or any other employment. But that is an entirely different thing from laying a special tax upon his receipts in a particular employment. If such a tax is laid, and the receipts taxed are those derived from transporting goods and passengers in the way of interstate or foreign commerce, no matter when the tax is exacted, whether at the time of realizing the receipts, or at the end of every six months or a year, it is an exaction aimed at the commerce itself, and is a burden upon it, and seriously affects it. A review of the question convinces us that the first ground on which the decision in *State Tax on Railway Gross Receipts* was placed is not tenable; that it is not supported by anything decided in *Brown* v. *Maryland;* but, on the contrary, that the reasoning in that case is decidedly against it.

The second ground on which the decision referred to was based was, that the tax was upon the franchise of the corporation granted to it by the state. We do not think that this can be affirmed in the present case. It certainly could not have been intended as a tax on the corporate franchise, because, by the terms of the act, it was laid equally on the corporations of other states doing business in Pennsylvania. If intended as a tax on the franchise of doing business, — which in this case is the business of transportation in carrying on interstate and foreign commerce, — it would clearly be unconstitutional. It was held by this court in the case of *Gloucester Ferry Company* v. *Pennsylvania,* 114 U. S. 196, that interstate commerce carried on by corporations is entitled to the same protection against state exactions which is given to such commerce when carried on by individuals. In that case the tax was laid upon the capital stock of a ferry company incorporated by New Jersey, and engaged in the business of transporting passengers and freight between Camden, in New Jer-

sey, and the city of Philadelphia. . The law under which the tax was imposed was passed by the legislature of Pennsylvania on the 7th of June, 1879, and declared " that every company or association whatever, now or hereafter incorporated by or under any law of this commonwealth, or now or hereafter incorporated by any other state or territory of the United States, or foreign government, and doing business in this commonwealth," . . . [with certain exceptions named,] " shall be subject to and pay into the treasury of the commonwealth annually a tax to be computed as follows, namely : " the amount of tax is then rated by the dividends declared, and imposed upon the capital stock of the company at the rate of so many mills, or fractions of a mill, for every dollar of such capital stock. It was contended that the ferry company could not hold property in Philadelphia for the purpose of carrying on its ferrying business, and could not carry on its said business there without a franchise, express or implied, from the state of Pennsylvania. But this court held, in its opinion, delivered by Mr. Justice Field, that the business of landing and receiving passengers and freight at the wharf in Philadelphia was a necessary incident to, and a part of, their transportation across the Delaware River from New Jersey ; that without it, that transportation would be impossible ; that a tax upon such receiving and landing of passengers and freight is a tax upon their transportation, that is, upon the commerce between the two states involved in such transportation ; and that Congress alone can deal with such transportation ; its non-action being equivalent to a declaration that it shall remain free from burdens imposed by state legislation. The opinion proceeds as follows : " Nor does it make any difference whether such commerce is carried on by individuals or corporations. *Welton* v. *Missouri*, 91 U. S. 275 ; *Mobile* v. *Kimball*, 102 U. S. 691. As was said in *Paul* v. *Virginia*, 8 Wall. 168, at the time of the formation of the Constitution, a large part of the commerce of the world was carried on by corporations ; and the East India Company, the Hudson Bay Company, the Hamburgh Company, the Levant Company, and the Virginia Company were mentioned as among the corporations which, from

the extent of their operations, had become celebrated throughout the commercial world. The grant of power [to Congress] is general in its terms, making no reference to the agencies by which commerce may be carried on. It includes commerce by whomsoever conducted, whether by individuals or corporations." p. 204. Again, "While it is conceded that the property in a state belonging to a foreign corporation engaged in foreign or interstate commerce may be taxed equally with like property of a domestic corporation engaged in that business, we are clear that a tax or other burden imposed on the property of either corporation because it is used to carry on that commerce, or upon the transportation of persons or property, or for the navigation of the public waters over which the transportation is made, is invalid and void as an interference with, and obstruction of, the power of Congress in the regulation of such commerce." p. 211. It is hardly necessary to add that the tax on the capital stock of the New Jersey Company, in that case, was decided to be unconstitutional, because, as the corporation was a foreign one, the tax could only be construed as a tax for the privilege or franchise of carrying on its business, and that business was interstate commerce.

The decision in this case, and the reasoning on which it is founded, so far as they relate to the taxation of interstate commerce carried on by corporations, apply equally to domestic and foreign corporations. No doubt the capital stock of the former, regarded as inhabitants of the state, or their property, may be taxed as other corporations and inhabitants are, provided no discrimination be made against them as corporations carrying on foreign or interstate commerce, so as to make the tax, in effect, a tax on such commerce. But their business as carriers in foreign or interstate commerce cannot be taxed by the state, under the plea that they are exercising a franchise.

There is another point, however, which may properly deserve some attention. Can the tax in this case be regarded as an income tax? and, if it can, does that make any difference as to its constitutionality? We do not think that it can properly be regarded as an income tax. It is not a general tax on

the incomes of all the inhabitants of the state; but a special tax on transportation companies.   Conceding, however, that an income tax may be imposed on certain classes of the community, distinguished by the character of their occupations; this is not an income tax on the class to which it refers, but a tax on their receipts for transportation only.   Many of the companies included in it may, and undoubtedly do, have incomes from other sources, such as rents of houses, wharves, stores, and water-power, and interest on moneyed investments. As a tax on transportation, we have already seen from the quotations from the *State Freight Tax Case* that it cannot be supported where that transportation is an ingredient of interstate or foreign commerce, even though the law imposing the tax be expressed in such general terms as to include receipts from transportation which are properly taxable.   It is unnecessary, therefore, to discuss the question which would arise if the tax were properly a tax on income.   It is clearly not such, but a tax on transportation only.

The corporate franchises, the property, the business, the income of corporations created by a state may undoubtedly be taxed by the state; but in imposing such taxes care should be taken not to interfere with or hamper, directly or by indirection, interstate or foreign commerce, or any other matter exclusively within the jurisdiction of the Federal government. This is a principle so often announced by the courts, and especially by this court, that it may be received as an axiom of our constitutional jurisprudence.   It is unnecessary, therefore, to review the long list of cases in which the subject is discussed. Those referred to are abundantly sufficient for our purpose. We may add, however, that since the decision of the *Railway Tax Cases* now reviewed, a series of cases has received the consideration of this court, the decisions in which are in general harmony with the views here expressed, and show the extent and limitations of the rule that a state cannot regulate or tax the operations or objects of interstate or foreign commerce. We may refer to the following: *Railroad Co.* v. *Husen*, 95 U. S. 465; *Cook* v. *Pennsylvania*, 97 U. S. 566; *Guy* v. *Baltimore*, 100 U. S. 434; *Webber* v. *Virginia*, 103 U. S. 344;

*Moran* v. *New Orleans*, 112 U. S. 69; *Walling* v. *Michigan*, 116 U. S. 446; *Pickard* v. *Pullman Co.*, 117 U. S. 34; *Wabash & St. Louis Railroad* v. *Illinois*, 118 U. S. 557; *Robbins* v. *Shelby County*, 120 U. S. 489; *Fargo* v. *Michigan*, 121 U. S. 230. The cases of *Moran* v. *New Orleans* and *Fargo* v. *Michigan* are especially apposite to the case now under consideration. As showing the power of the states over local matters incidentally affecting commerce, see *Munn* v. *Illinois*, 94 U. S. 113, 123, and other cases in the same volume, viz: *Chicago & Burlington Railroad* v. *Iowa*, pp. 155, 161; *Peik* v. *Chicago & Northwestern Railway*, pp. 164, 176; *Winona & St. Peter Railroad* v. *Blake*, p. 180, as explained by *Wabash Co.* v. *Illinois*; *The Wharfage Cases*, viz., *Packet Co.* v. *Keokuk*, 95 U. S. 80, *Packet Co.* v. *St. Louis*, 100 U. S. 423, 428, *Packet Co.* v. *Catlettsburg*, 105 U. S. 559, 563; *Transportation Co.* v. *Parkersburg*, 107 U. S. 691, 698; *Ouachita Packet Co.* v. *Aiken*, 121 U. S. 444; *Mobile* v. *Kimball*, 102 U. S. 691; *Brown* v. *Houston*, 114 U. S. 622, 630; *Railroad Commission Cases*, 116 U. S. 307; *Coe* v. *Errol*, 116 U. S. 517.

It is hardly within the scope of the present discussion to refer to the disastrous effects to which the power to tax interstate or foreign commerce may lead. If the power exists in the state at all, it has no limit but the discretion of the state, and might be exercised in such a manner as to drive away that commerce, or to load it with an intolerable burden, seriously affecting the business and prosperity of other states interested in it; and if those states, by way of retaliation, or otherwise, should impose like restrictions, the utmost confusion would prevail in our commercial affairs. In view of such a state of things which actually existed under the Confederation, Chief Justice Marshall, in the case before referred to, said: "Those who felt the injury arising from this state of things, and those who were capable of estimating the influence of commerce on the prosperity of nations, perceived the necessity of giving the control over this important subject to a single government. It may be doubted whether any of the evils proceeding from the feebleness of the Federal government contributed more to that great revolution which introduced the

present system, than the deep and general conviction that commerce ought to be regulated by Congress. It is not, therefore, matter of surprise, that the grant should be as extensive as the mischief, and should comprehend all foreign commerce, and all commerce among the states. To construe the power so as to impair its efficacy, would tend to defeat an object, in the attainment of which the American public took, and justly took, that strong interest which arose from a full conviction of its necessity." 12 Wheat. 446.

Nothing can be added to the force of these words.

Our conclusion is, that the imposition of the tax in question in this cause was a regulation of interstate and foreign commerce, in conflict with the exclusive powers of Congress under the Constitution.

*The judgment of the Supreme Court of Pennsylvania is, therefore, reversed, and the case is remanded to be disposed of according to law, in conformity with this opinion.*