

# THE ATTORNEY GENERAL
# OF TEXAS

AUSTIN 11, TEXAS

GROVER SELLERS
~~XXXXXXXXXXX~~
ATTORNEY GENERAL

Honorable W. R. Chambers, Chairman
Revenue & Taxation Committee
Honorable W.W. Roark, Chairman
Insurance Committee
House of Representatives
Forty-ninth Legislature
Austin, Texas

Gentlemen:                    Opinion No. O-6443
                              Re:  Constitutionality of House Bill No.
                                   23, and House Bill No. 54, concern-
                                   ing taxes on insurance companies.

          We have your request for an opinion as to the constitu-
tionality of House Bill No. 23 and House Bill No. 54, and reply
thereto as follows:

          House Bill No. 23 provides that the insurance companies
therein named shall pay an annual tax equal to three percent (3%)
of the gross amount of premiums collected during the year ending
December 31, preceding, said tax subject to be reduced, however,
as follows:

          ". . . however, if the annual statement of
     such insurance organization, as of December 31,
     preceding, shows such organization to have in-
     vested in Texas Securities, as defined by Article
     4766 of the Revised Civil Statutes of Texas, 1925,
     as amended, an amount equal to ten (10%) per cent
     of its admitted assets, then its tax shall be two
     and seventy-five hundredths (2.75%) per cent of
     such gross premium receipts; if the annual state-
     ment shows such insurance organization to have
     invested in such Texas Securities on such date an
     amount equal to fifteen (15%) per cent of its
     admitted assets, then its tax shall be two and
     one-half (2½%) per cent of such gross premium
     receipts; if the annual statement shows such or-
     ganization to have invested in such Texas Securi-
     ties on such date an amount equal to eighteen
     (18%) per cent of its admitted assets, then its
     tax shall be two (2%) per cent of such gross pre-
     mium receipts; if the annual statement shows such
     insurance organization to have invested in such

Texas Securities on such date an amount equal to
twenty-two (22%) per cent of its admitted assets,
then its tax shall be one and one-half (1½%) per
cent of such gross premium receipts; and if the
annual statement shows such insurance organization
to have invested in such Texas Securities on such
date an amount equal to twenty-five (25%) per
cent of its admitted assets, then its tax shall
be three-fourths of one (3/4%) per cent of such
gross premium receipts. . . . . ."

House Bill No. 54 amends Article 7064 of the Revised
Civil Statutes of 1925 as amended so as to provide that the in-
surance companies named therein shall pay an annual tax of three
per cent (3%) upon the gross amount of premiums received upon
property located in this state or other risks located in this
state during the preceding year, said taxes subject to be reduced,
however, as follows:

". . . if any such insurance carrier shall
have as much as ten (10%) per cent of its admitted
assets, as shown by such sworn statement, invested
in real estate in this state; bonds of the State
of Texas; bonds or interest bearing warrants of
any county, city, town, school district or any mu-
nicipality or subdivision which is now or may here-
after be constituted or organized and authorized
to issue such bonds or warrants under the Consti-
tution and laws of this state, notes or bonds
secured by mortgage or trust deed insured by the
Federal Housing Administrator; the case deposits
in regularly established national or state banks
or trust companies in this state on the basis of
average monthly balances throughout the calendar
year; that percentage of such insurance company's
investments in the bonds of the United States of
America, that its Texas Reserves are of its total
reserves; but this provision shall apply only to
United States Government Bonds purchased between
December 8, 1941 and the termination of the war in
which the United States is now engaged; in any
other property in this state in which by law such
insurance carriers may invest their funds, then
the annual tax of any such insurance carrier shall
be two and seventy-five hundredths (2.75%) per
cent of its said gross premium receipts; if any
such insurance carrier shall have invested in such
securities on such date as much as fifteen (15%)
per cent of its admitted assets, then the annual
tax of such insurance carrier shall be two and
one-half (2½%) per cent of such gross premium

receipts; if any such insurance carrier shall have
invested in such securities on such date as much as
eighteen (18%) per cent of its admitted assets, then
the annual tax of such insurance carrier shall be
two (2%) per cent of such gross premium receipts;
if any such insurance carrier shall have invested in
such securities on such date as much as twenty-two
(22%) per cent of its admitted assets, then the
annual tax of such insurance carrier shall be one
and one-half (1½%) per cent of such gross premium
receipts; and if any such insurance carrier shall
have invested in such securities on such date as
much as twenty-five (25%) per cent of its admitted
assets, then the annual tax shall be three-fourths
(3/4%) of one (1) per cent of such gross premium
receipts.    ..............."

House Bill No. 54 also provides that foreign assessment
casualty companies admitted to do business in Texas under Chapter
5, Title 78, Revised Civil Statutes of Texas of 1925, shall also
pay a tax of three percent (3%) of their gross premium receipts
from Texas business, said tax subject to be reduced, however, as
follows:

". . . Provided, however, if any such company
shall have an amount equal to one half of the gross
amount of assessments, dues, premiums, or other a-
mounts collected from policyholders within this
State during the preceding year, as shown by the
sworn statement herein required to be filed, in-
vested in any or all of the above-mentioned secur-
ities, then the annual tax of such company shall
be one and one-half (1½%) per cent of its said re-
ceipts for such preceding period, and if such
company shall have invested as aforesaid an amount
equal to the gross amount of such receipts for
the preceding year, as shown by said sworn state-
ment, then the annual tax of such company shall
be one-half (½) of one (1) per cent of its said
receipts.

". . . . ."

Article 1, Section 8, of the Constitution of the United
States, is in part as follows:

"The Congress shall have Power . . . .

"To regulate Commerce with foreign Nations, and
among the several States, and with the Indian Tribes;

                    ". . . . ."

          The United States Supreme Court recently held in the
case of United States v. South-Eastern Underwriters Association
et al., 88 Law Ed. 1082, that the business of insurance, when
some of its activities are across state lines, is inter-state
commerce and comes within the inter-state commerce clause of the
United States Constitution, therefore, there is raised the
question of whether or not House Bill No. 23 and House Bill No.
54 are constitutional, on the ground that they are discrimina-
tory as between domestic and foreign companies doing business in
Texas.

          We have recently received from Honorable Fred Hansen,
First Assistant Attorney General of Oklahoma, a memorandum on
this question wherein he was dealing with a similar law that was
before the Legislature of Oklahoma. We agree with the memoran-
dum so prepared, therefore, we here quote and adopt same:

          "Would a proposed law of this State, levying
     an annual tax against both domestic and foreign
     insurance companies doing business in Oklahoma,
     equal to 3% of the total amount of premiums, less
     authorized deductions, collected thereby from
     Oklahoma business during a calendar year, for the
     privilege of doing business in Oklahoma during the
     succeeding license year, be an invalid discrimina-
     tory law within the meaning of the Commerce Clause
     of the Constitution of the United States, if said
     law in effect provides, as stated in its title,
     that:

                    such tax shall be two and seventy-five
               hundredths (2/75%) per cent if ten (10%)
               per cent of such companies' admitted as-
               sets are invested in Oklahoma securities,
               two and one-half (2½%) per cent if fif-
               teen (15%) per cent of such companies'
               admitted assets are invested in Oklahoma
               securities, two (2%) per cent if eighteen
               (18%) per cent of such companies' admit-
               ted assets are invested in Oklahoma se-
               curities, one and one-half (1½%) per cent
               if twenty-two (22%) per cent of such com-
               panies' admitted assets are invested in
               Oklahoma securities, three-fourths of one
               (1%) per cent if twenty-five (25%) per
               cent of such companies' admitted assets
               are invested in Oklahoma securities, one-
               half of one (1%) per cent if thirty-five

(35%) per cent of such companies' admit-
ted assets are invested in Oklahoma secur-
ities, and no tax if fifty (50%) per cent
of such companies' admitted assets are
invested in Oklahoma securities?

"It is contended that the above proposed law
is non-discriminatory for the asserted reason that
both domestic and foreign insurance companies do-
ing business in this State can invest any percent-
age of their admitted assets in Oklahoma securities
that they desire, and that the mere fact that most
domestic insurance companies have approximately
50% of their admitted assets invested at this time
in Oklahoma securities and hence would not be re-
quired to pay any part of said 3% tax while most
foreign insurance companies have less than 10% of
their admitted assets invested at this time in
Oklahoma securities and hence would be required
to pay all of said 3% tax, is immaterial.

"In this connection attention is called to
a recent memorandum prepared by Professors Dowling
and Patterson of the School of Law of Columbia
University for certain committees of the American
Life Convention and for the Life Insurance Asso-
ciation of America wherein the important case of
Bethlehem Motors Co. v. Flynt, 256 U.S. 421, 65
L. ed 1029 (1921) was reviewed as follows:

"'North Carolina required a license tax
of $500 of all persons or corporations
engaged in selling automobiles within the
State, and the statute contained a pro-
viso that if three-fourths of the "entire
assets" of the manufacturer of the auto-
mobiles were invested in securities of,
or in property located within, the State,
the tax should be reduced to $100. Plain-
tiffs (including two foreign corporations
engaged in the manufacture of automobiles
and two domestic corporations engaged in
the sale) attacked the statutory scheme
as a denial of equal protection of the
laws and as a regulation of interstate
commerce. They won on both grounds. If
the sales were considered wholly intra-
state, that is, occurring after the inter-
state transaction was completed, there
was "a real discrimination" contrary to

the equal protection clause of the Four-
teenth Amendment; if, on the other hand,
the sales were considered a part of the
interstate transaction, the commerce clause
stood in the way.'

"Inasmuch as the Bethlehem case, supra, pro-
bably is the case most directly in point as to the
issues raised in this memorandum the syllabus is
quoted herein as follows:

"'1.  Foreign corporations doing business
in a state, and having an agent  there,
are within the jurisdiction of the state
for the purpose of suit  against  them.

"'2.  A state act imposing a license tax
upon all manufacturers or persons or cor-
porations engaged in selling automobiles
in the state unconstitutionally discrim-
inates against nonresident manufacturers
doing business in the state through local
sales agents, where it reduces the tax to
one fifth of its normal amount if the man-
ufacturer of the automobiles has three
fourths of his assets invested in  the
bonds of the state or of some of its muni-
cipalities, or in other property situated
therein and returned for taxation.

"'3.  The imposition of a state license
tax upon local agents to whom automobiles
are consigned for sale by their nonresi-
dent manufacturers, which discriminates
in favor of the product of resident manu-
facturers, is an unconstitutional attempt
by the state to regulate interstate com-
merce, it being in effect a tax upon  the
importation of the automobiles into the
state.'
"

"In the body of the opinion appears the fol-
lowing language:

"'It will be observed, however, that the
act under review applies to all manufactur-
ers and persons engaged in selling automo-
biles in the state.  The act makes  no
distinctions between nonresident and resi-
dent manufacturers.  Wherein, then,  is

there discrimination?  It is contended to
be in the provision which reduces the tax
to one fifth of its amount--from $500 to
$100--if the manufacturer of the automo-
biles has three fourths of his  assets
invested in the bonds of the  state  or
some of its municipalities, or in other
property situated therein, and returned for
taxation.  The provision is declared to be
impossible of performance, and its effect
to be that a manufacturer not having such
investment of property is charged $500 for
a license, and one having such investment
of property is charged only $100.  And
plaintiffs in error, it is asserted, are
necessarily in the $500 class.  The con-
trasting assertion is that local manufac-
turers are in the $100 class, and that ,
therefore, there is illegal discrimination
in their favor. * * * *

"'In resistance to the assertion that the
provision discriminates against nonresident
manufacturers, the attorney general contends
that it is as applicable to resident manu-
facturers as to nonresident manufacturers,
and, of course, his inference is that its
condition can be performed as easily by one
as by the other, and discriminates against
neither.

"'To this we cannot assent.  The condition
can be satisfied by a resident manufacturer,
his factory and its products in the first in-
stance being within the state; it cannot be
satisfied by a nonresident manufacturer, his
factory necessarily being in another state,
some of its products only at a given time
being within the state.  Therefore, there is
a real discrimination, and an offense against
the 14th Amendment, if we assume that the cor-
porations are within the state.

"'If they are not within the state, their
second contention is that the act is an at-
tempt to regulate interstate commerce.  If
it have that effect it is illegal; for a tax
on an agent of a foreign corporation, for
the sale of a product, is a tax on the pro-
duct, and if the product be that of another

state, it is a tax on commerce between the
states. * * *'

"The principles of law announced in the above
case were followed in the case of Best & Company,
Inc. v. Maxwell, Commissioner of Revenue for the
State of North Carolina, 311 U.S. 454, 85 L. ed
275, the syllabus being as follows:

"'1.   The commerce clause forbids discrimi-
nation, whether forthright or ingenious.

"'2.   Whether a state statute unconstitu-
tionally discriminates against commerce
is to be determined, not by the ostensible
reach of its language, but by its practi-
cal operation.

"'3.   A state statute levying an annual
privilege tax of $250 on every person or
corporation not a regular retail merchant
in the state, who displays samples in any
room rented  or occupied temporarily  for
the purpose of securing  retail  orders,
unconstitutionally discriminates against
commerce, where the only tax to which reg-
ular retail merchants in the state are
subject is a tax of $1.00 per annum for the
privilege of doing business,  even  where
they engage in the sale of goods by sample
in display rooms at places other than that
in which their retail stores are located.'

"In the body of the opinion it is stated:

"'The commerce clause forbids discrimina-
tion, whether forthright or ingenious.
In each case it is our duty to determine
whether the statute under attack, whatever
its name may be, will in its practical
operation on work discrimination against in-
terstate commerce.'

"Probably the most recent decision involving
issues such as are presented in this memorandum is
General Trading Company v. State Tax Commission of
the State of Iowa,_____ U.S. _____, 88
L. ed 914, the third paragraph of the syllabus
being as follows:

"'While no state can tax the privilege of
doing interstate business, the mere fact
that property is used for interstate com-
merce or has come into an owner's posses-
sion as a result of interstate commerce,
does not exempt it from state taxation,
so long as such taxation is not obviously
hostile or practically discriminatory
toward such commerce.'

"In the body of the opinion it is stated:

"'Of course, no State can tax the privi-
lege of doing interstate business. See
Western Live Stock v. Bureau, 303  U. S.
250, 82 L ed 823, 58 S Ct 546, 115 ALR
944.  That is within the protection of
the Commerce Clause and subject to the
power of Congress.  On the other hand,
the mere fact that property is used for
interstate commerce or has come into an
owner's possession as a result of inter-
state commerce does not diminish the pro-
tection which it may draw from a State
to the upkeep of which it may be asked
to bear its fair share. But a fair
share precludes legislation obviously
hostile or practically discriminatory
toward interstate commerce.  See Best &
Co. v. Maxwell, 311 US 454, 85 L ed 275,
61 S Ct 334.'

"In consideration of the principles of law
announced in the above decisions it is clear that
a state law which either on its face, or as a mat-
ter of practical application, discriminates against
a foreign insurance company doing business in this
State would be invalid under the Commerce Clause of
the Constitution of the United States.

"The contention that the proposed law, here-
tofore referred to, is non-discriminatory for the
asserted reason that both domestic and foreign in-
surance companies doing business in this State can
invest any percentage of their admitted assets in
Oklahoma securities that they desire, and that a
foreign insurance company by investing 50% of its
admitted assets in Oklahoma securities can, like a
domestic insurance company, escape payment of said
3$ privilege tax, apparently does not take into

consideration the practical operation of said
proposed law.  In this connection it will be noted:

>"(a) that if said proposed law is valid
>a similar law in each of the other states
>would likewise be valid, and that if such
>laws have been or are enacted it will be
>impossible for an insurance company doing
>business, for instance, in 40 of the 48
>states to invest 50% of their admitted
>assets in each of said states,
>
>"(b)  that since, for example, the Metro-
>politan Life Insurance Company has admit-
>ted assets aggregating approximately
>$6,463,803,552.00, it would be required
>under said proposed law to invest approx-
>imately $3,231,901,776.00 of said assets
>in Oklahoma in order to escape said tax
>even though the total amount of premiums
>collected in Oklahoma during the  last
>reported calendar year only aggregated
>$2,511,649.00, and
>
>"(c)  that it would be a practical impos-
>sibility for said company to purchase
>$3,231,901,776.00 in Oklahoma securities."

In addition to the decisions referred to by Mr.
Hansen, we direct your attention to the following:

In the case of Gwin, White and Prince, Inc., v. Henne-
ford, 83 L. Ed. 272, the Supreme Court of the United States had
under consideration the question of whether or not a Washington
tax measured by the gross receipts from the business of marketing
fruit shipped from Washington to the places of sale in various
states and in foreign countries was a burden on interstate commerce
under the Commerce Clause of the Federal Constitution.  In hold-
ing said tax unconstitutional on the ground that it was a viola-
tion of said Commerce Clause, in that it was not limited to
receipts from the activities within the state but applied to
gross receipts from activities both within and without the state,
the court laid down the following rules of law which are appli-
cable here:

>"While appellant is engaged in business with-
>in the state, and the state courts have sustained
>the tax as laid on its activities there, the inter-
>state commerce service which it renders and for
>which the taxed compensation is paid is not wholly

performed within the state.  A substantial part
of it is outside the state where sales are nego-
tiated and written contracts of sale are executed,
and where deliveries and collections are made.
Both the compensation and the tax laid upon it
are measured by the amount of the commerce--the
number of boxes of fruit transported from Washing-
ton to purchasers elsewhere;  so that the tax,
though nominally imposed upon appellant's activi-
ties in Washington, by the very method of its
measurement reaches the entire interstate commerce
service rendered both within and without the state
and burdens the commerce in direct proportion to
its volume.

"  . . . . But it is enough for present pur-
poses that under the commerce clause, in the ab-
sence of congressional action, state taxation,
whatever its form,  is precluded  if  it discrimi-
nates against interstate commerce or undertakes
to lay a privilege tax measured by gross receipts
derived from activities in such commerce which
extend beyond the territorial limits of the taxing
state.  Such a tax, at least when not apportioned
to the activities carried on within the state, see
Wisconsin & M. R. Co. v. Powers, 191 U. S. 379,
48 L. ed. 229, 24 S. Ct. 107; Maine v. Grand Trunk
R. Co. 142 U.S. 217, 35 L. ed. 994, 12 S. Ct. 121,
163, 3 Inters. Com. Rep. 807;  Cudahy Packing Co.
v. Minnesota, 246 U.S. 450, 62 L. ed. 827, 38 S.
Ct. 373;  United States Exp. Co. v. Minnesota, 223
U.S. 335, 56 L. ed. 601, 12 S. Ct. 810, 4 Inters.
Com. Rep. 79, and American Mfg. Co.  v. St. Louis,
250 U.S. 459, 62 L. ed. 1084, 39 S. Ct. 522, supra,
burdens the commerce in the same manner and to
the same extent as if the exaction were for the
privilege of engaging in interstate commerce and
would, if sustained, expose it to multiple tax bur-
dens, each measured by the entire amount of the
commerce, to which local commerce is not subject.

"Here the tax, measured by the entire volume
of the interstate commerce in which appellant par-
ticipates, is not apportioned to its activities
within the state.  If Washington is free to exact
such a tax, other states to which the commerce
extends may, with equal right, lay a tax similarly
measured for the privilege of conducting within
their respective territorial limits the activities
there which contribute to the service.  The present
tax, though nominally local, thus in its practical

operation discriminates against interstate commerce,
since it imposes upon it, merely because interstate
commerce is being done, the risk of a multiple bur-
den to which local commerce is not exposed.  J. D.
Adams Mfg. Co. v. Storen, supra (304 U.S. 310, 311,
82 L. ed. 1368, 1369, 58 S. Ct. 913, 117 A.L.R.
429); of. Fargo v. Michigan (Fargo v. Stevens) 121
U.S. 230, 30 L. ed. 888, 7 S. Ct. 857, 1 Inters.
Com. Rep. 51; Philadelphia & S. Mail S.S. Co. v.
Pennsylvania, 122 U.S. 326, 30 L. ed. 1200, 7 S. Ct.
1118, 1 Inters. Com. Rep. 308; Galveston, H. & S.A.
R. Co. v. Texas, 210 U.S. 217, 225, 227, 52 L. ed.
1031, 1036. 1037, 28 S. Ct. 638; Meyer v. Wells,
F. & Co. 223 U. S. 298, 56 L. ed. 445, 32 S. Ct.
218; Crew Levick Co. v. Pennsylvania, 245 U. S.
292, 62 L. ed. 295, 38 S. Ct. 126; Fisher s Blend
Station v. Tax Commission, 297 U. S. 650, 80 L.
ed. 956, 56 S. Ct. 608; see Western Live Stock v.
Bureau of Revenue, supra (303 U. S. 260, 82 L. ed.
830, 58 S. Ct. 546, 115 A.L.R. 944). Such a mul-
tiplication of state taxes, each measured by the
volume of the commerce, would re-establish the bar-
riers to interstate trade which it was the object
of the commerce clause to remove. Unlawfulness of
the burden depends upon its nature, measured in
terms of its capacity to obstruct interstate com-
merce, and not on the contingency that some other
stat e may first have subjected the commerce to a
like burden.

                "· · · · · ·"

        In the case of Postal Telegraph Cable Co. v. Adams 39
Law ed. 311, the Supreme Court of the United States was passing
upon the right of the state to levy a charge upon a foreign
telegraph company, doing business within the state and also doing
an interstate business, in the form of a franchise tax, but
arrived at with reference to, and graduated according to, the
value of the property within the state and in lieu of all other
taxes, and this right was upheld as not being a regulation of
interstate commerce and did not put an unconstitutional restraint
thereon.

        In the case of Looney v. Crane Co., 62 L. Ed. 230, the
Supreme Court of the United States was passing upon Texas statutes
which required foreign corporations to file their articles of in-
corporation with the Secretary of State and to pay certain permits
and franchise taxes based upon the amount of their capital stock.
These amounts had been increased from time to time until this
suit was brought by the Crane Co. to enjoin the enforcement of

such statutes on the grounds that they were repugnant to the
Commerce Clause of the Constitution of the United States, as
well as to the due process and equal protection clauses thereof.
In holding that the enforcement of said statute should be en-
joined, the court held:

> "It may not be doubted under the case stated
> that, intrinsically and inherently considered,
> both the permit tax and the tax denominated as a
> franchise tax were direct burdens on interstate
> commerce, and, moreover, exerted the taxing au-
> thority of the state over property and rights which
> were wholly beyond the confines of the state, and
> not subject to its jurisdiction, and therefore con-
> stituted a taking without due process. It is also
> clear, however, that both the permit tax and the
> franchise tax exerted a power which the state un-
> doubtedly possessed; that is, the authority to
> control the doing of business within the state by
> a foreign corporation and the right to tax the in-
> trastate business of such corporation, carried on
> as the result of permission to come in. The sole
> contention, then, upon which the acts can be sus-
> tained, in that although they exerted a power which
> could not be called into play consistently with the
> Constitution of the United States, they were yet
> valid because they also exercised an intrinsically
> local power. But this view can only be sustained
> upon the assumption that the limitations of the
> Constitution of the United States are not paramount,
> but are subordinate to and may be set aside by
> state authority as the result of the exertion of a
> local power. In substance, therefore, the propo-
> sition must rest upon the theory that our dual
> system of government has no existence because the
> exertion of the lawful powers of the one involves
> the negation or destruction of the rightful author-
> ity of the other. But original discussion is un-
> necessary, since to state the proposition is to
> demonstrate its want to foundation, and because
> the fundamental error upon which it rests has been
> conclusively established. Indeed, the cases refer-
> red to were concerned in various forms with the
> identical questions here involved, and authorita-
> tively settled that the states are without power
> to use their lawful authority to exclude foreign
> corporations by directly burdening interstate com-
> merce as a condition of permitting them to do bus-
> iness in the state, in violation of the Constitution,
> or, because of the right to exclude, to exert the

power to tax the property of the corporation and
its activities outside of and beyond the jurisdic-
tion of the state, in disregard, not only of the
commerce clause, but of the due process clause of
the 14th Amendment. . . . . ."

Many other decisions might be referred to and quoted
from in line with the above holdings and, while said House Bill
No. 23 and House Bill No. 54 contain the same provisions as to
domestic and foreign insurance companies, the difference, and
possible discrimination, arises in the application of said pro-
visions whereby said taxes are reduced.  It is very likely that
domestic companies will have most, if not all, of their admitted
assets invested in property and Texas securities whereby the
amount of said taxes can be reduced, and it is just as likely
that foreign companies will have their admitted assets invested
in their home and other states, possibly under similar provi-
sions in the laws of said other states, and in many instances it
will be almost impossible for such companies to comply with the
provisions of these bills in order to reduce the amount of their
taxes as can be done by domestic companies.  As an illustration
of what we are trying to say, we call your attention to the
report of a foreign insurance company which was filed with the
Board of Insurance Commissioners and which would furnish the
basis for compliance with these bills.  Its admitted assets
were $1,456,973.26; its total reserves were $1,047,577.00; its
Texas reserves were $30,827.00; its required investments of
its Texas reserves which is necessary in order to secure a per-
mit to do business in Texas was  $23,120.00; and its gross
premiums for the preceding year were $13,000.00.  In order to
avail itself of the reduction in tax as is given to domestic
companies under these bills, it would have to invest the re-
quired percent of its admitted assets.  If it were also doing
business in other states which had the same requirements, it
would hardly be possible for such companies to meet the require-
ments of this law and secure the same tax rate as domestic
companies can have by merely investing their property in their
home state.  In addition, it would seem to be an attempt to
compel foreign companies to bring into Texas assets accumula-
ted from business done in other states and over which Texas
has no jurisdiction.

We have devoted a lot of time to a study of the
various questions raised by the decision in the South-Eastern
case and, while we have not found any decision dealing with a
similar situation since the question had not been heretofore
raised as to insurance, the decisions above referred to, as
well as many others we have read, cause us to have great doubt
that said bills, as now written, can or will be upheld, since
they may be held to be discriminatory and in violation of the

Commerce Clause of the Constitution of the United States.

        Trusting that this satisfactorily answers your re-
quest, we remain

                        Very truly yours

                        ATTORNEY GENERAL OF TEXAS


                              By s/Ardell Williams
                                    Ardell Williams
                                    Assistant

                              By s/Jas. W. Bassett
                                    Jas. W. Bassett
                                    Assistant

JWB:mp:wc


APPROVED MAR 3, 1945
s/Grover Sellers
ATTORNEY GENERAL OF TEXAS

Approved Opinion Committee By s/WMR Chairman