The **PHILADELPHIA EAGLES FOOTBALL CLUB, INC.,** Appellant,

v.

**CITY OF PHILADELPHIA.**

City of Philadelphia, Appellant,

v.

**The Philadelphia Eagles Football Club, Inc.**

Commonwealth Court of Pennsylvania.

Argued Dec. 8, 1999.

Decided July 26, 2000.

Alice W. Beck, Philadelphia, for appellant, the Phila. Eagles Football Club, Inc.

Frank Paiva, Jr., Philadelphia, for appellee, City of Phila.

BEFORE: DOYLE, President Judge, PELLEGRINI, Judge, FRIEDMAN, Judge, KELLEY, Judge, LEADBETTER, Judge.

KELLEY, Judge.

The Philadelphia Eagles Football Club, Inc. (Eagles, Inc.) and the City of Philadelphia (Philadelphia) both appeal from a final order of the Court of Common Pleas of Philadelphia County (trial court) which reversed in part and affirmed in part a decision of the Philadelphia Tax Review Board (Tax Board). We affirm.

On June 3, 1994, Eagles, Inc. filed a petition for refund with the Tax Board. The petition sought relief for assessments of wage taxes for the years 1991 and 1994 totaling $63,932.19 and business privilege taxes of $730,705.39 for the years 1986 and 1992. On October 5, 1994, Eagles, Inc. filed another petition for refund with the Tax Board seeking a refund of $250,197.00 in business privilege taxes for the years 1986 through 1992 claiming an overpayment due to erroneous calculation of the percentage of media receipts which should

have been included in Eagles, Inc.'s taxable gross receipts. The Tax Board held hearings from December 14, 1995 to September 24, 1996. Based upon the testimony and evidence presented, the Board made the following findings of fact.

Eagles, Inc. owned and operated the Philadelphia Eagles football team (Eagles Team) for all tax years in question. Norman Braman (Mr. Braman), a resident of Florida, owned and operated Eagles, Inc. during all the tax years in question. Eagles, Inc. was a member of the National Football League (NFL), a member association, for all the tax years in question. As a member of the NFL, Eagles, Inc. shared in a percentage of the revenues received by the NFL from its contract with a major television network for the right to televise all NFL football games (Network Contract). The NFL had twenty-eight football teams during this time period, and each team received one twenty-eighth of the Network Contract revenue for all tax years in question (referred to as "media receipts"). Eagles Team played one-half of its games in Philadelphia and the other half at the other teams' venues. Pursuant to the Network Contract negotiated by the NFL on behalf of its member teams, all games were televised.

With regard to deductions taken for airplane expenditures, the Tax Board found that Eagles, Inc. purchased an airplane in order to accommodate various activities of the Eagles Team and Mr. Braman. Mr. Braman used the airplane to travel to and from his home in Florida and the various sites where the Eagles Team played football. In addition, Mr. Braman used the airplane to attend meetings across the country for various NFL committees. Mr. Braman also used the airplane to attend other business interests unrelated to Eagles, Inc.'s business, such as vacation trips and other personal trips as well as charter trips for unrelated third parties. Eagles, Inc. was reimbursed certain monies for the various charter trips, but these reimbursements were below the actual cost to Ea-

gles, Inc. to operate the airplane. As per the airplane use log for 1991, the airplane had a total of 135.95 hours of use. It was used for commuting 31.78% or 43.2 hours, vacation travel for 15.45% or 21 hours, charters for 21.27% or 28.91 hours, and Eagles business for 28.86% or 39.24 hours.

With regard to the percentage of Mr. Braman's salary subject to the Philadelphia Wage Tax (Wage Tax), the Tax Board found that in order to compute the number of working days which Mr. Braman spent in Philadelphia, Mr. Braman and his accountant reviewed Mr. Braman's diaries, airplane, hotel and other travel documents which he may have had available. From this information, Eagles, Inc. submitted four summarized time sheets covering Mr. Braman's whereabouts during 1991. These exhibits were prepared several years after the tax year in question in preparation for the proceedings. The exhibits were not made available at the time of the audit and therefore could not be reviewed by the auditor in making his initial assessment for 1991. Mr. Braman and his accountant used various diaries and travel documentation to piece them together. The summaries were, admittedly by Mr. Braman, estimations of his activities with some inaccuracies and conflicting information. Noting some inconsistencies among these four exhibits with respect to which days Mr. Braman was in Philadelphia, the Tax Board found that when taken as a whole picture, Mr. Braman was in Philadelphia for 61 days out of 200 working days, or 30.5%. This figure of 61 days is taken by adding up the total days from each of the four exhibits that Mr. Braman admitted to being in Philadelphia, during which time, Mr. Braman was receiving his annual salary of $5 million from Eagles, Inc.

By decision mailed December 3, 1997, the Tax Board held that one-half of the media receipts received by Eagles, Inc. should be included in the gross receipts for the Philadelphia Business Privilege Tax (BPT) assessment as a fee for services

performed in Philadelphia. The Tax Board characterized the media receipts as fees for services rendered, i.e., the playing of the team's scheduled games. Since the Eagles Team played only one-half of its games in Philadelphia and the remaining one-half of its games in other team's venues, only one-half of the media receipts received for the rendering of these services are to be included in Eagles, Inc.'s gross receipts.

The Tax Board also held that 30.5% of Mr. Braman's salary is subject to the Wage Tax based upon a composite of the four exhibits pertaining to Mr. Braman's time allocation in Philadelphia. The Tax Board further held that additional compensation attributable to Mr. Braman, and subject to the 30.5% apportionment for the Wage Tax, included the difference between the standard value for charter flights and the amount of reimbursement to Eagles, Inc. by Mr. Braman, airplane costs for commuting to and from Florida, and cost to Eagles, Inc. for Mr. Braman's vacation, medical and other unreimbursed personal use of the airplane.

Additionally, the Tax Board held that only 28.86% of the total airplane expenses of $1,311,836.00 could be deducted by Eagles, Inc. The Tax Board held that Eagles, Inc. could deduct charter expenses up to the amount of charter income reported. The Board reasoned that while all of Eagles, Inc.'s deductions may have adhered to Generally Accepted Accounting Principles (GAAP) and all deductions were in accordance therewith, such deductions are not necessarily the equivalent of valid deductions for purposes of the BPT. Deductibility for standard accounting purposes as a legitimate expense does not necessarily equal deductibility for tax purposes. Only depreciation and expenses that are business related are deductible for purposes of determining net income for BPT. Vacation, medical and charter flights were not related to Eagles, Inc.'s business activities. Therefore, expenses and depreciation attributable to these flights are disallowed as deductions. To the extent that any airplane expenses are to be treated as non-cash compensation to Mr. Braman, these should be treated as deductible compensation expenses by Eagles, Inc.

Lastly, the Tax Board concluded that Eagles, Inc. is not entitled to any abatement or adjustment of interest or penalties. The Tax Board explained that Eagles, Inc.'s deduction with regard to the airplane and depreciation expenses clearly went beyond the scope of its activities when only 28.86% of the hours of airplane use were for its own business purposes. Eagles, Inc. knew or should have known that it was not reasonable to claim a 100% deduction for expenses associated with this plane when over 70% of its time was for other than its own business activities. The Tax Board further explained that the Wage Tax issue could very well have been resolved at the audit had Eagles, Inc. and Mr. Braman provided the time logs and calculations which were made available to the Tax Board.

From this decision, Eagles, Inc. filed an appeal with the trial court on December 15, 1997, under Docket No. 9712–2250. The following day, Philadelphia filed a cross appeal under Docket No. 9712–2353. Following oral argument on the cross appeals, the trial court, by order dated December 31, 1998, reversed in part and affirmed in part the Tax Board's decision. The trial court reversed the Tax Board's conclusion that Eagles, Inc.'s media receipts are fees for services and found as a matter of law that Eagles, Inc.'s media receipts are royalties, all of which are subject to taxation under the BPT. The trial court affirmed the Tax Board's decision in all other respects.

From this decision, Eagles, Inc. and Philadelphia both filed timely appeals with this Court. By order of this Court dated February 11, 1999, both appeals were consolidated.

In this appeal, Eagles, Inc. has raised the following issues for our review: [1]

1. For purposes of calculating the BPT on gross receipts, should Eagles, Inc.'s share of revenues paid by television networks to the National Football League be apportioned to reflect the fact that the revenues arose in part as a result of activities that occurred outside of Philadelphia.

2. Should the network television revenues be apportioned at the rate of 50% to reflect that the Eagles Team played 50% of its games in Philadelphia.

3. Alternatively, should the network television revenues be apportioned $\frac{1}{28}$th to Philadelphia to reflect the fact that the television revenues received by Eagles, Inc. are earned by all 28 teams in the NFL and thus only $\frac{1}{28}$th of the revenues result from games played in Philadelphia.

4. Should all the airplane expenses deducted by Eagles, Inc., in its financial statements, certified as prepared in accordance with GAAP, also be deducted in computing the BPT on net income.

5. For purposes of determining the amount of airplane expenses deductible in calculating the BPT on net income, should the fixed expenses Eagles, Inc. incurred in the operation of its airplane be deducted in their entirety, since Eagles, Inc. necessarily incurred them regardless of the deductibility of the variable expense.

6. Should Mr. Braman's compensation, subject to Wage Tax, be based on the time Mr. Braman actually spent in Philadelphia in the tax years at issue.

7. Should Mr. Braman's compensation, subject to Wage Tax, include uses of the airplane characterized by the Board as non-cash compensation.

8. Should the interest and penalties imposed on Eagles, Inc. be abated when it acted in good faith and relied on reasonable interpretations of federal laws, Pennsylvania statutes, and Philadelphia's ordinance and regulations.

In the cross appeal filed by Philadelphia, Philadelphia has raised the following additional issues:

1. Did the Tax Board err by finding that personal expenses should be reclassified as a business expense (i.e., compensation to Mr. Braman), as opposed to disallowing the expense or reclassifying the amount as a dividend to its sole shareholder, Mr. Braman.

2. Did the Tax Board err by finding 30.5% of Mr. Braman's time was spent in Philadelphia, as opposed to 40% as assessed.

Essentially, the issues raised by both Eagles, Inc. and Philadelphia can be divided into four categories: Media Receipts; Deductibility of Airplane Expenses; Wage Taxes; and Interest and Penalty.

## I. *MEDIA RECEIPTS*

The First Class City Business Tax Reform Act [2] (Tax Reform Act) grants the authority to Philadelphia, as a first-class city, to levy and collect an annual tax on the taxable receipts of businesses operating within its city limits. Section 3 of the Tax Reform Act, 53 P.S. § 16183. Pursu-

---

**1.** This Court's scope of review where, as here, the trial court takes no additional evidence is whether constitutional rights were violated, an error of law was committed, or the Board's findings of fact were supported by substantial evidence. Section 754(b) of the Local Agency Law, 2 Pa.C.S. § 754(b); *Phila-*

*delphia, Department of Revenue v. Tax Review Board of the City of Philadelphia To the Use of Sawin Systems, Inc.*, 157 Pa.Cmwlth. 43, 628 A.2d 1220 (1993).

**2.** Act of May 30, 1984, P.L. 345, *as amended*, 53 P.S. §§ 16181–16193.

ant to this authority, Philadelphia enacted Chapter 19–2600 of the Philadelphia Code, Business Privilege Taxes, which imposed the BPT in the year 1985.[3]

Under the Philadelphia Code, the BPT is imposed on the gross receipts and net income[4] of "every person engaging in any business in the City...." Section 19–2603 of the Philadelphia Code. Receipts are defined as:

Cash, credits, property of any kind or nature, received from conducting any business or by reason of any sale made, including resales of goods, wares or merchandise taken by a dealer as a trade-in or as part payment for other goods, wares or merchandise or services rendered or commercial or business transactions, without deduction therefrom on account of the cost of property sold, materials used, labor, service or other cost, interest or discount paid or any other expense.

Section 19–2601 of the Philadelphia Code. The related regulations further provide that "all patent, copyright and trademark royalties" are to be included in the measure of tax on receipts. Section 322 of the City of Philadelphia Business Privilege Tax Regulations (BPT Regulations).[5]

■ In the case before us, the trial court characterized Eagles, Inc.'s gross media receipts as copyright "royalties resulting from the licensing of a property right" subject to full taxation under Sec-

---

3. The BPT succeeded both the General Business Tax and the Mercantile License Tax in 1985, as authorized by the Tax Reform Act.

4. Section 19–2601 of the Philadelphia Code provides:

(a) "Net income" shall, at the option of the taxpayer, which option shall not be revokable [sic] by the taxpayer after it has been exercised as provided for by the collector, be either:

(1) The net gain from the operation of a business, after provision for all allowable costs and expenses actually incurred in the conduct thereof, either paid or accrued in accordance with the accounting system used, without deduction of taxes based on income; or

(2) The taxable income from any business activity as returned to and ascertained by the Federal Government prior to giving effect to the exclusion for dividends received and net operating loss, subject to the following adjustments:

(c) The collector shall establish rules and regulations and methods of apportionment and allocation and evaluation so that only that part of such net income or net operating loss which is properly attributable and allocable to the doing of business in the city of the first class levying the tax shall be taxed hereunder. The collector may make an apportionment and allocation with due regard to the nature of the business concerned on the basis of mileage, the ratio of the taxable receipts of the taxpayer from within the city to the total receipts of the taxpayer, the ratio of the value of the tangible personal and real property owned or leased and situated in the city levying the tax to the total tangible personal and real property of the taxpayer wherever owned and situated, the ratio of the wages, salaries, commissions and other compensation paid by the taxpayer within the city levying the tax to the total wages, salaries, commissions and other compensation paid by the taxpayer, and any other method or methods of apportionment and allocation other than the foregoing, calculated to effect a fair and proper apportionment and allocation. The net income of a person which is described as being subject to a tax pursuant to Article VII, VIII, IX or XV of the act of March 4, 1971 (P.L. 6, No. 2), known as the Tax Reform Code of 1971, shall be allocated, and apportioned to a city of the first class in accordance with, a fraction of which the numerator shall be "receipts" as defined and limited in this section, and the denominator shall be receipts regardless of whether received in or apportionable to the city of the first class.

(d) After apportioning and allocating net income, apportioned and allocated net operating losses carried forward shall be deducted.

5. Revised July 1989. Section 322 provides:

Except as otherwise provided, where a taxpayer, whether a domestic or foreign corporation or any other type of business entity, maintains its commercial domicile in Philadelphia, all patent, copyright and trademark royalties received are to be included in the measure of tax unless attributable to business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia.

tion 322 of the BPT Regulations. Therefore, the starting point in our analysis is whether the media receipts are fees from the licensing of a property right.

### A. *Licensing of a Property Right*

Eagles, Inc. maintain that the trial court mischaracterized the media receipts as "copyright royalties" from the licensing of a property right rather than treating them as fees for services rendered, i.e. playing football games. We disagree.

The Network Contract provides for the transfer of the right to broadcast the live telecast of the football games. Section 1 of the Network Contract, entitled "Television Rights Transferred," provides that the Networks shall have standard over-the-air broadcast telecasting rights to all regular season games, post season games, and pre-season night games telecast. Network Contract pp. 1–2, Reproduced Record (R.) 782a–783a. In return, the NFL receives rights fees or media receipts from the network. *See* Network Contract p.22, R. 803a. These receipts are then divided evenly among the member clubs. NFL By-laws p. 30, R. 859a.

Contrary to Eagles, Inc.'s position, this payment is not a fee for services rendered,[6] but for the transfer of the right to telecast. While the obligation to play the game is a component of the contract, the transfer of the right to broadcast the game is the crux of the contract. Eagles, Inc., as a member of the NFL, is not being paid media receipts by the network to simply

play the game, but for the *exclusive* right to telecast the game. A game that is played but not telecast by the network is of no value to the network.[7] Likewise, the Network Contract would be of little value to the network if the right to broadcast was not exclusive and other media outlets were allowed to simultaneously broadcast the live game. We further note that the contractual relationship between the networks and the NFL clubs has been previously characterized as a contract for the sale or transfer of broadcast rights. *See Shaw v. Dallas Cowboys Football Club, Ltd.*, 172 F.3d 299 (3d. Cir.1999); *Mid-South Grizzlies v. National Football League*, 720 F.2d 772 (3d. Cir.1983), *cert. denied*, 467 U.S. 1215, 104 S.Ct. 2657, 81 L.Ed.2d 364 (1984); *United States v. National Football League*, 196 F.Supp. 445 (E.D.Pa.1961). *See also, United States Football League v. National Football League*, 842 F.2d 1335 (2d. Cir.1988); *National Football League v. McBee & Bruno's, Inc.*, 792 F.2d 726 (8th Cir.1986); *WTWV, Inc. v. National Football League*, 678 F.2d 142 (11th Cir.1982). We, therefore, conclude that the trial court's characterization of the receipts as fees for the transfer of a property right is correct.

### B. *Right To Broadcast*

Eagles, Inc. further maintains that the media receipts received are not "copyright royalties" because the right to broadcast is

---

**6.** Under the Philadelphia Code, receipts or portion of receipts received for any services actually performed outside the limits of a city of the first class and not for the purpose of evading or avoiding payment of the tax, or any portion of it imposed, are excluded from the business privilege tax. Section 19–2601 of the Philadelphia Code. Taxable receipts of persons making sales or rendering services both inside and outside a city of the first class, or both, are to be segregated. *Id.*

**7.** The Network Contract takes this into account and provides that if for any reason beyond the network's control, a game is played but is not telecast by the network and

no other NFL game telecast can be substituted, the rights fees will be reduced by the network's out-of-pocket production costs in connection with the canceled telecast, plus such required rebates to advertising sponsors as are fairly allocable to the canceled telecast. Network Contract p. 8, R. 789a. Similarly, when a game is not played, the network is only entitled to a refund of the rights fees when no other NFL games are available for substitute telecast and equivalent game telecasts cannot be made available to the network on a date and at a time suitable to the network. Network Contract p. 19–20, R. 800a–801a.

not a right attendant to copyright. We disagree.

The United States Constitution delegates the power to grant and regulate copyright to Congress. Article I, Section 8, Clause 8 provides:

> The Congress shall have Power ... To promote the Progress of Science and useful Arts, by securing for limited Times to Authors and Inventors the exclusive Right to their respective Writings and Discoveries.

Pursuant to this authority, Congress has implemented legislation for the protection of a copyright. Most recently, Congress enacted the Copyright Act of 1976 (1976 Copyright Act) [8] which took effect January 1, 1978.[9]

The 1976 Copyright Act provides for the protection of "original works of authorship fixed in any tangible medium of expression, now known or later developed, from which they can be perceived, reproduced, or otherwise communicated, either directly or with the aid of a machine or device." Section 102 of the 1976 Copyright Act, 17 U.S.C. § 102(a). This protection includes the live transmissions of sporting events when they are recorded simultaneously with transmission.[10] *See* Congressional Notes to Section 102 of the 1976 Copyright Act.[11]

The law attempts to foster creation by giving copyright owners exclusive rights to reproduce the work, prepare derivative works, distribute copies of the work, and

---

8. 17 U.S.C. § 101 et seq.

9. The Act expressly preempted rights under state law that are equivalent to any of the rights encompassed by a federal copyright. Section 301 of the 1976 Copyright Act, 17 U.S.C. § 301.

10. We note, however, that the actual performance game is not protected by copyright unless it is "fixed" or recorded. *See National Basketball Association v. Motorola, Inc.*, 105 F.3d 841, 847 (2d. Cir.1997) ("recorded broadcasts of NBA games—as opposed to the games themselves—are now entitled to copyright protection.").

11. The Congressional Notes to Section 102 provide, in pertinent part:

> The bill seeks to resolve, through the definition of "fixation" in section 101 [section 101 of this title], the status of live broadcasts—sports, news coverage, live performances of music, etc.—that are reaching the public in unfixed form but that are simultaneously being recorded. When a football game is being covered by four television cameras, with a director guiding the activities of the four cameramen and choosing which of their electronic images are sent out to the public and in what order, there is little doubt that what the cameramen and the director are doing constitutes "authorship." The further question to be considered is whether there has been a fixation. If the images and sounds to be broadcast are first recorded (on a video tape, film, etc.) and then transmitted, the recorded work would be considered a "motion picture" subject to statutory protection against unauthorized reproduction or retransmission of the broadcast. If the program content is transmitted live to the public while being recorded at the same time, the case would be treated the same; the copyright owner would not be forced to rely on common law rather than statutory rights in proceeding against an infringing user of the live broadcast.
>
> Thus, assuming it is copyrightable—as a "motion picture" or "sound recording," for example—the content of a live transmission should be regarded as fixed and should be accorded statutory protection if it is being recorded simultaneously with its transmission. On the other hand, the definition of "fixation" would exclude from the concept purely evanescent or transient reproductions such as those projected briefly on a screen, shown electronically on a television or other cathode ray tube, or captured momentarily in the "memory" of a computer.
>
> Under the first sentence of the definition of "fixed" in section 101 [section 101 of this title], a work would be considered "fixed in a tangible medium of expression" if there has been an authorized embodiment in a copy or phonorecord and if that embodiment "is sufficiently permanent or stable" to permit the work "to be perceived, reproduced, or otherwise communicated for a period of more than transitory duration." The second sentence makes clear that, in the case of "a work consisting of sounds, images, or both, that are being transmitted," the work is regarded as "fixed" if a fixation is being made at the same time as the transmission.

publicly perform or display the work. These five rights are commonly referred to as the "bundle of rights". Section 106(1)–(5) of the 1976 Copyright Act, 17 U.S.C. § 106(1)–(5).[12] The right to "perform" an audiovisual work means the right "to show its images in any sequence or to make the sounds accompanying it audible." Section 101 of the 1976 Copyright Act, 17 U.S.C. § 101. Encompassed within this right is the right to broadcast an audiovisual work. *Baltimore Orioles v. Major League Baseball Players Association,* 805 F.2d 663, 677 (7th Cir.1986), *cert. denied,* 480 U.S. 941, 107 S.Ct. 1593, 94 L.Ed.2d 782 (1987). *See* House Report at 63, reprinted in 1976 U.S.Code Cong. & Adm. News at 5676–77 ("[A] broadcasting system is performing when it transmits ... [a] performance ...; a local broadcaster is performing when it transmits the network broadcast; a cable television system is performing when it retransmits the broadcast to its subscribers....").

Each of the five rights comprising the copyright may be subdivided indefinitely, and under copyright law, each subdivision of an exclusive right may be transferred and separately owned. Section 201(d) of the 1976 Copyright Act, 17 U.S.C. § 201(d).[13] The "transfer of copyright ownership" is "an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license." 17 U.S.C. § 101.

In addition to transferring any of the bundle of rights, copyright owners may also enjoin, seek attorney's fees, or seek actual or statutory damages from anyone who violates their bundle of rights. 17 U.S.C. § 501–505. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner. 17 U.S.C. § 201(d).

In the case before us, there is no dispute that the broadcasted NFL games are copyrighted works. The only aspect of the copyright that has been transferred is the *exclusive license* to broadcast the live telecast of the football game. Network Contract p. 2, R. 783a. As discussed above, the right to broadcast is a right attendant to copyright. The fact that none of the other rights attendant to the copyright

---

**12.** Section 106 provides:
> Subject to sections 107 through 118, the owner of copyright under this title has the exclusive rights to do and to authorize any of the following:
> (1) to reproduce the copyrighted work in copies or phonorecords;
> (2) to prepare derivative works based upon the copyrighted work;
> (3) to distribute copies or phonorecords of the copyrighted work to the public by sale or other transfer of ownership, or by rental, lease, or lending;
> (4) in the case of ... motion pictures and other audiovisual works, to perform the copyrighted work publicly; and
> (5) in the case of ... the individual images of a motion picture or other audiovisual work, to display the copyrighted work publicly.

**13.** Section 201(d), Transfer of Ownership, provides:
> (1) The ownership of a copyright may be transferred in whole or in part by any means of conveyance or by operation of law, and may be bequeathed by will or pass as personal property by the applicable laws of intestate succession.
> (2) Any of the exclusive rights comprised in a copyright, including any subdivision of any of the rights specified by section 106, may be transferred as provided by clause (1) and owned separately. The owner of any particular exclusive right is entitled, to the extent of that right, to all of the protection and remedies accorded to the copyright owner by this title.

17 U.S.C. § 201(d).

Under the 1909 Copyright Act, copyright was regarded as an indivisible and single bundle of rights. The individual rights comprising that bundle could not be separately owned and could only be assigned as a whole. *See Jim Henson Productions, Inc. v. John T. Brady & Associates, Inc.,* 16 F.Supp.2d 259, 288 (S.D.N.Y.1997). *See generally* 3 Nimmer, § 10.01 at 10–5 to 10–19; A.L. Kaminstein, Study No. 11, Divisibility of Copyrights (1957) in 1 Studies on Copyright 623 (1963).

were transferred to the network, such as the right to copy or rebroadcast the football game, does not diminish or alter the fact that the exclusive right to broadcast the live telecast was transferred as the rights attendant to copyright are divisible and alienable.

### C. Copyright Owner

Alternatively, Eagles, Inc. contends that the networks could not possibly be paying the NFL copyright royalties for the use of the copyrighted work because the network, not the NFL, authored the actual game telecast. We disagree.

■■■ In exchange for the transfer of a copyright, copyright owners are paid a royalty. Although the term "royalty" is not defined by the 1976 Copyright Act, the Philadelphia Code, or the BPT Regulations, royalty commonly refers to compensation for the use of or right to use of works protected by copyright.[14] Black's Law Dictionary[15] (7th Ed.1999) (royalty is "a payment made to an author or inventor for each copy of a work or article sold under a copyright or patent").

Before a person can derive income from royalties, it is fundamental that he must have an ownership interest in the property whose licensing or sale gives rise to the income. A "copyright owner," with respect to any one of the exclusive rights comprised in a copyright, refers to the owner of that particular right. Generally, ownership of a copyright "vests initially in the author or authors of the work."[16] Section 201(a) of the 1976 Copyright Act, 17 U.S.C. § 201(a). However, in the case of a work made for hire, the employer or other person for whom the work was prepared is considered the author and owns all of the rights comprised in the copyright, unless the parties have expressly agreed otherwise in a written instrument signed by them. Section 201(b) of the 1976 Copyright Act, 17 U.S.C. § 201(b).

Although Eagles, Inc. attempts to maintain that the Network, not the NFL, is the copyright owner,[17] our review of the Network Contract reveals that the reverse is actually true. The Network Contract expressly provides that the "League on behalf of member clubs is deemed owner of copyright on live telecasts made under this agreement." Network Contract p. 21, R. 802a. All that was transferred to the network was the exclusive right to transmit the live broadcast. Network Contract p. 2, R. 783a. While we recognize that the networks, through their creative efforts of recording, directing, producing

---

14. When words of a statute are not defined, we are guided by the principles set forth in the Statutory Construction Act of 1972 (Statutory Construction Act), which provide that such words shall be construed according to their common and approved usage. Section 1903 of the Statutory Construction Act, 1 Pa. C.S. § 1903. While the Statutory Construction Act, is not expressly applicable to the construction of local ordinances, the principles contained therein are nevertheless useful. *Council of Middletown Township v. Benham*, 514 Pa. 176, 523 A.2d 311 (1987). The objective of statutory construction is to determine the legislative intent. Absent a contrary intent by the Philadelphia City Council, the words used in local ordinances, like statutes, should be construed according to their common and approved usage. *Id.;* Section 1903 of the Statutory Construction Act.

15. The courts of this Commonwealth generally use dictionaries as source material to determine the common and approved usage of a term. *Fogle v. Malvern Courts, Inc.*, 554 Pa. 633, 722 A.2d 680 (1999); *Love v. Philadelphia*, 518 Pa. 370, 543 A.2d 531 (1988).

16. The term "author" is not defined by the 1976 Copyright Act.

17. We find this argument to be disingenuous. We further note that the briefs submitted by the Eagles are inconsistent in this regard. On page 16 of Eagles, Inc.'s brief, the Eagles claim sole ownership of the copyright on live telecasts made under the Network Contract in support of its position that the networks cannot be paying the NFL for the copyright because the NFL retains the copyright. However, on pages 3 to 5 of Eagles, Inc.'s reply brief, the Eagles argue that the networks cannot be paying the NFL for the copyright because networks authored the copyrighted work.

and broadcasting the live event, have arguably "authored" the copyrighted work, this authorship does not establish any rights of ownership as the parties have expressly agreed in a written instrument that the NFL, not the networks, owns all of the rights comprised in the copyright.

Under the BPT Regulations "all patent, copyright and trademark royalties received are to be included in the measure of tax." Section 322 of the BPT Regulations. As the copyright owner, the NFL on behalf of the member clubs owns all exclusive rights attendant thereto, including the right to broadcast the live football game telecast. Having transferred to the network the exclusive right to broadcast the live telecast, the NFL received payment in the form of media receipts which was then divided among the twenty-eight clubs. While the Network Contract does not refer to this form of payment as a "royalty," the payment nevertheless constitutes a royalty as that term is commonly defined as it is payment for the use of a copyright. We, therefore, conclude that the media receipts are "copyright royalties" subject to the BPT.

### D. *Commerce Clause*

Eagles, Inc. contends that the failure to apportion the media receipts attributable to football games played outside of Philadelphia violates the Commerce Clause of the United States Constitution. We disagree.

The Commerce Clause provides that Congress shall have the power to "regulate Commerce . . . among the several States," U.S. Const., Art. I, § 8, cl. 3. Despite this express grant of power, the judiciary has consistently held this language to contain a further, negative command, known as the dormant Commerce Clause, prohibiting certain state taxation even when Congress has failed to legislate on the subject. *Oklahoma Tax Commission v. Jefferson Lines, Inc.*, 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261 (1995); *Quill Corporation v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992); *Northwestern States Portland Cement Company v. Minnesota*, 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421 (1959); *H.P. Hood & Sons, Inc. v. Du Mond*, 336 U.S. 525, 69 S.Ct. 657, 93 L.Ed. 865 (1949).

Historically, all state taxes levied on interstate commerce were strictly proscribed. *Jefferson Lines.* Early United States Supreme Court cases made it clear that interstate commerce was wholly immune from state taxation. *See Leloup v. Port of Mobile*, 127 U.S. 640, 8 S.Ct. 1380, 32 L.Ed. 311 (1888); *Philadelphia & Southern Mail Steamship Company v. Pennsylvania*, 122 U.S. 326, 7 S.Ct. 1118, 30 L.Ed. 1200 (1887); *Fargo v. Michigan*, 121 U.S. 230, 7 S.Ct. 857, 30 L.Ed. 888 (1887); *Robbins v. Shelby County Taxing District*, 120 U.S. 489, 7 S.Ct. 592, 30 L.Ed. 694 (1887). But in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 97 S.Ct. 1076, 51 L.Ed.2d 326 (1977), the United States Supreme Court abandoned this formalistic approach and articulated a standard that has governed cases since.[18]

---

18. We note that the old formalism began to yield in *Western Live Stock v. Bureau of Revenue*, 303 U.S. 250, 58 S.Ct. 546, 82 L.Ed. 823 (1938), wherein a practical approach to the commerce clause review of gross receipts taxes developed.

*Western Live Stock* involved the application of the New Mexico gross receipts tax to advertising revenues earned by a magazine publisher with a substantial interstate circulation. The Supreme Court stated that "[i]t was not the purpose of the commerce clause to relieve those engaged in interstate commerce from their just share of state tax burden even though it increases the cost of doing the business. 'Even interstate business must pay its way' " by being subjected to state gross receipts tax. 303 U.S. at 254, 58 S.Ct. 546 (quoting *Postal Telegraph–Cable Company v. Richmond*, 249 U.S. 252, 259, 39 S.Ct. 265, 63 L.Ed. 590 (1919)). However, the Court added a caveat that a particular interstate activity could not be burdened by multiple taxes not borne by local commerce. *Id.* at 257, 58 S.Ct. 546. The test is whether the particular interstate activity could or might be exposed to multiple tax burdens imposed by successive state taxing authorities. *Id.*

The standard created in *Complete Auto* was the following four-part test for determining the validity of state taxes under the Commerce Clause:

1. The tax must be applied to an activity that has a substantial nexus with the state;
2. The tax must be fairly apportioned to the taxpayer's activity;
3. The tax must not discriminate against interstate commerce; and
4. The tax must be fairly related to benefits provided by the state.

*Id.* at 279, 97 S.Ct. 1076.

■ Under this standard, all tax burdens do not impermissibly impede interstate commerce. *Department of Revenue of the State of Washington v. Association of Washington Stevedoring Companies*, 435 U.S. 734, 98 S.Ct. 1388, 55 L.Ed.2d 682 (1978). The Commerce Clause balance tips against the tax only when it unfairly burdens commerce by exacting more than a just share from the interstate activity. *Id.*

### 1. *Substantial Nexus*

■ In order for there to be a substantial nexus between the tax and the activity, there must be some minimal connection between the interstate activities and the taxing state and a rational relationship between the income attributed to the state and the intrastate values of the enterprise. *Trinova Corporation v. Michigan Department Of Treasury*, 498 U.S. 358, 111 S.Ct. 818, 112 L.Ed.2d 884 (1991); *Mobil Oil Corporation v. Commissioner of Taxes of Vermont*, 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). The nexus requirement serves to limit the reach of a state taxing authority so as to ensure that state taxation does not unduly burden interstate commerce. *Quill*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91.

Here, Philadelphia is not only the commercial domicile of Eagles, Inc. but also the home territory of the Eagles Team. This presence is more than enough to establish substantial nexus for Commerce Clause analysis.

### 2. *Apportionment*

■ The apportionment requirement is one of long standing in Commerce Clause analysis. *Western Live Stock.* See, *e.g., Cudahy Packing Company v. Minnesota*, 246 U.S. 450, 38 S.Ct. 373, 62 L.Ed. 827 (1918); *United States Express Company v. Minnesota*, 223 U.S. 335, 32 S.Ct. 211, 56 L.Ed. 459 (1912); *Wisconsin & Michigan Railway Company v. Powers*, 191 U.S. 379, 24 S.Ct. 107, 48 L.Ed. 229 (1903); *Maine v. Grand Trunk Railway Co. of Canada*, 142 U.S. 217, 12 S.Ct. 121, 35 L.Ed. 994 (1891); *Pullman's Palace-Car Company v. Pennsylvania*, 141 U.S. 18, 26, 11 S.Ct. 876, 35 L.Ed. 613 (1891). This requirement necessitates a rational relationship between the income attributed to the state and the intrastate values of the enterprise. *Tyler Pipe Industries, Inc. v. Washington State Dept. of Revenue*, 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199 (1987). The purpose of the apportionment requirement is to ensure that each state taxes only its fair share of an interstate transaction. *Jefferson Lines*, 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261.

■ Avoidance of multiple taxation, or the risk of multiple taxation, is the test of apportionment. *Jefferson Lines.* A properly apportioned tax must be both internally and externally consistent. *Id.; Goldberg v. Sweet*, 488 U.S. 252, 262, 109 S.Ct. 582, 102 L.Ed.2d 607 (1989). Internal consistency is preserved when the imposition of a tax identical to the one in question by every other state would add no

The Court ultimately held that the interstate publishing activities of the taxpayer must bear their fair share of the cost of local government and that gross receipts from the advertising activity sought to be taxed by the state

of New Mexico were unlikely to be subjected to a tax by any other state. *Id.* The risk of multiple taxation was, thus, minimal or non-existent, and the tax could stand. *Id.*

burden to interstate commerce that intrastate commerce would not also bear. *Id.* Internal consistency does not preclude multiple states from taxing the same transaction so long as the portion of the income taxed by each state is not taxed by another state. *Id.* "This test asks nothing about the degree of economic reality reflected by the tax, but simply looks to the structure of the tax at issue to see whether its identical application by every State in the Union would place interstate commerce at a disadvantage as compared with commerce intrastate." *Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331.

External consistency, on the other hand, looks to the economic justification for the state's claim upon the value taxed, to discover whether the tax reaches beyond the portion of value that is fairly attributable to economic activity within the taxing state. *Id.* The question is whether the state has taxed only that portion of the revenues from the interstate activity which reasonably reflects the in-state component of the activity being taxed. *Goldberg.*[19]

Applying these principles of apportionment here, we find that there is no failure of internal consistency. The BPT Regulations provide that where a taxpayer *maintains its commercial domicile in Philadelphia,* all copyright royalties received are to be included in the measure of tax unless attributable to business conducted ·at a place of business regularly maintained by the taxpayer outside of Philadelphia. Section 322 of the BPT Regulations. If every jurisdiction were to impose a tax identical to the BPT, then each jurisdiction would only be able to tax copyright royalties for

taxpayers having their commercial domicile within its boundaries. Eagles, Inc., having its commercial domicile within Philadelphia, would not be subject to such a tax in other taxing jurisdictions. Although Eagles, Inc. maintains that it is open to multiple taxation, Eagles, Inc. has not presented any evidence or argument that its share of the media receipts is actually taxed in other jurisdictions. *See Northwestern,* 358 U.S. at 463, 79 S.Ct. 357 ("There is nothing to show that multiple taxation is present. We cannot deal in abstractions.").

The risk of multiple taxation is further diminished by the fact that any receipts attributable to "business conducted at a place of business regularly maintained by the taxpayer outside of Philadelphia" are excluded from the measure of tax. Section 322 of the BPT Regulations. While the Eagles Team does play one-half of its games in other locales outside of Philadelphia, this activity does not amount to the maintenance of a place of business outside of Philadelphia for purposes of the BPT.

We further find that there is no failure of external consistency. External consistency looks not to the logical consequences of cloning, but to the economic justification for the state's claim upon the value taxed, to discover whether a state's tax reaches beyond that portion of value that is fairly attributable to economic activity within the taxing state. *Jefferson Lines,* 514 U.S. at 185, 115 S.Ct. 1331. With external consistency, the threat of real multiple taxation (though not by liter-

---

**19.** When the Commerce Clause was interpreted to permit taxation of only local incidents of interstate commerce, the danger of multiple taxation was handled within that doctrine. *Mobil Oil Corporation v. Commissioner of Taxes,* 136 Vt. 545, 550, 394 A.2d 1147, 1150 (1978), *affirmed,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510 (1980). The validity of the tax rested upon whether the state was exacting a constitutionally fair demand for that interstate activities to which it bore a special relation. *Id.* No other state could tax the same monies because the special relation was lacking. *Id.* As the states began laying broad taxes on gross receipts not tied to a geographical area or taxes on net income, the Court increasingly sanctioned the use of apportionment formulas to insure that extraterritorial values were not taxed and to guard against multiple taxation. *Id.* If a jurisdiction is taxing according to the amount of business activity within its borders, that is, if the tax is fairly apportioned, there can be no multiple taxation. *Id.; Northwestern.*

ally identical statutes) may indicate a state's impermissible overreaching. *Id.*

Philadelphia is taxing copyright royalties of its domiciliary taxpayers. Copyrights, like other intellectual property rights, constitute intangible property. *Lucker Manufacturing, Inc. v. Home Insurance Company,* 23 F.3d 808, 819 (3d. Cir.1994). *See* Black's Law Dictionary (6th Ed.1990) (intangible property is "such property as has no intrinsic and marketable value, but is merely the representative or evidence of value, such as certificates of stock, bonds, promissory notes, copyrights, and franchises.").

For purposes of taxation, Pennsylvania has long held that the situs of intangible personal property is at the domicile of the owner or taxpayer. *See Commonwealth v. Pennsylvania Coal Company,* 197 Pa. 551, 47 A. 740 (1901). Thus, any income from intangible personal property, such as interest, dividends, patent or copyright royalties, and gains or losses from sales of such property, would also be allocated in accordance with the domiciliary situs of the taxpayer.

Philadelphia has an economic justification for taxing Eagles, Inc.'s media receipts or copyright royalties. First, Eagles, Inc. is commercially domiciled in Philadelphia. Second, the economic activities of playing football, recording and broadcasting the football games, which gives rise to the royalty income, take place in Philadelphia.

Eagles, Inc., however, contends that Philadelphia is only entitled to tax one-half of the receipts on the basis that only one-half of the games are played, recorded and broadcast in Philadelphia. Relying on *Mobil,* 445 U.S. 425, 100 S.Ct. 1223, 63 L.Ed.2d 510, Eagles, Inc. asserts that when income from intangibles arises from activities occurring in more than one state, the income must be apportioned to reflect the amount of activity that occurred in the taxing jurisdiction.

*Mobil* involved the issue of whether a state could tax corporate income from intangibles of a non-domiciliary corporation earned from investments with foreign subsidiaries. Mobil Oil Corporation operated an integrated petroleum business and was commercially domiciled in New York. Mobil's activities in Vermont were limited to the marketing of its petroleum products. Part of Mobil's business was conducted outside the United States through wholly and partly owned subsidiaries and affiliates from which it received substantial dividends. Mobil excluded these dividends in reporting net income subject to apportionment by Vermont. Vermont sought to tax its share of this income on the basis that the dividend income was business income. The Supreme Court of Vermont held that the dividends must be included and the United States Supreme Court affirmed.

The United States Supreme Court determined that "the linchpin of apportionability in the field of state income taxation is the unitary-business principle." *Mobil,* 445 U.S. at 439, 100 S.Ct. 1223. In order to exclude income from apportionment, a taxpayer must show that the income was generated by a nonbusiness related activity or by a discrete business enterprise. *Id.* In the absence of such proof, there is an incontestable presumption of the requisite nexus. *Id.* The Court held that if the underlying activities generating the dividend income are derived from the operating activities of the functionally integrated whole, the income is constitutionally apportionable. *Id.*

*Mobil,* however, is distinguishable from the case at hand for two reasons. First, *Mobil* involved the issue of whether a non-domiciliary state could tax corporate dividends. *Mobil* did not address whether the state of corporate domicile would have the right to tax such income,[20] which is the

---

20. In fact, Mobil argued that only the state of corporate domicile should have the right to tax such income.

issue we are presented with in the case at hand.

■ Second, and perhaps more importantly, is that *Mobil* dealt with multi-state corporate structure and the unitary business principle. The unitary business principle is a method for estimating the fair share of the income tax base of a multijurisdictional – multistate or multinational – corporation. *Container Corporation of America v. Franchise Tax Board,* 463 U.S. 159, 103 S.Ct. 2933, 77 L.Ed.2d 545 (1983); *ASARCO, Inc. v. Idaho State Tax Commission,* 458 U.S. 307, 102 S.Ct. 3103, 73 L.Ed.2d 787 (1982); *Mobil.*

■ The unitary business principle considers affiliated groups of firms as a single business divided into purely formal, separately incorporated subsidiaries for reasons of legal convenience. *See Container.* The unitary business principle is based upon the rationale that when the instate portion of a business is related with the out-of-state portion of that business, the overall operations should be taken into account in determining the amount of joint income that should be taxed by the various states involved. *See Container; ASARCO.*

■ Application of the unitary business principle is highly fact specific. *See Allied–Signal, Inc. v. Director, Division of Taxation,* 504 U.S. 768, 112 S.Ct. 2251, 119 L.Ed.2d 533 (1992); *ASARCO.* In determining whether a business is unitary, the Court looks at the way in which the corporate enterprise is structured and operates, and of the relationship with the taxing state. *ASARCO,* 458 U.S. at 327 n. 22, 102 S.Ct. 3103. Additionally, the Court examines the factors of profitability in the operation relationships of in-state and out-of-state entities, i.e. contributions to income resulting from functional integration, centralization of management, and economies of scale. *ASARCO,* 458 U.S. at 317, 102 S.Ct. 3103; *Mobil,* 445 U.S. at 438, 100 S.Ct. 1223. In order to exclude certain income from the apportionment formula,

the Supreme Court has held that the company must prove that the income was earned in the course of activities unrelated to those carried out in the taxing state. *ASARCO,* 458 U.S. at 319, 102 S.Ct. 3103; *Mobil,* 445 U.S. at 441, 100 S.Ct. 1223.

Although Eagles, Inc. maintains that it is a "unitary business," Eagles, Inc. has not alleged any facts which would support such a finding. Even to the extent that an argument can be supported that the NFL and its member clubs constitute a "unitary business," application of the unitary business principle is still misplaced in this case as Philadelphia was not attempting to tax the NFL's share of the gross receipts which would require utilization of the apportionment formula under *Mobil.* We, therefore, conclude that taxation of Eagles, Inc.'s media receipts without apportionment does not violate the apportionment prong of the *Complete Auto* test.

### 3. *Discrimination*

■ A state may not impose a tax which discriminates against interstate commerce by providing a direct commercial advantage to local business. *Jefferson Lines,* 514 U.S. 175, 115 S.Ct. 1331, 131 L.Ed.2d 261; *Northwestern,* 358 U.S. 450, 79 S.Ct. 357, 3 L.Ed.2d 421. States are barred from discriminating against foreign enterprises competing with local businesses and from discriminating against commercial activity occurring outside the taxing state. *Jefferson Lines.* A tax which by its terms or operation imposes greater burdens on out-of-state goods or activities than on competing in-state goods or activities is unlawfully discriminatory under the Commerce Clause and will be struck down. *Tyler Pipe,* 483 U.S. 232, 107 S.Ct. 2810, 97 L.Ed.2d 199.

Eagles, Inc. maintains that the tax discriminates against interstate commerce by subjecting Eagles, Inc. to the risk of multiple taxation in other jurisdictions, a risk to which a purely local entity is not subject. Having determined above that the threat of multiple taxation is nonexistent, we find

no merit in this argument that the tax discriminates against interstate activity. We further note that there are no "purely local entities" in the field of professional football. Professional football as structured through the NFL is an interstate activity. As a result, there is no comparable competition acting solely within the taxing jurisdiction of Philadelphia to lend a commercial advantage.

#### 4. *Fair Relation*

∎ Last, the Commerce Clause demands a fair relation between a tax and the benefits conferred upon the taxpayer by the state. The test is whether the tax is reasonably related to the extent of taxpayer contact with the state, since it is the activities or presence of the taxpayer in the state that may properly be made to bear a just share of state tax burden. *Commonwealth Edison Company v. Montana*, 453 U.S. 609, 101 S.Ct. 2946, 69 L.Ed.2d 884 (1981). This prong is closely related to the nexus requirement. Generally, if the business has the requisite nexus with the state, then the tax meets the fourth factor simply because the business has enjoyed the opportunity and protections which the state has afforded it.

∎ The fair relation prong does not require a detailed accounting of the services provided to the taxpayer on account of the activity being taxed, nor is a state limited to offsetting the public costs created by the taxed activity. Interstate commerce may thus be made to pay its fair share of state expenses and "contribute to the cost of providing all governmental services, including those services from which it arguably receives no direct 'benefit.'" *Goldberg*, 488 U.S. at 267, 109 S.Ct. 582 (quoting *Commonwealth Edison*, 453 U.S. at 627 n. 16, 101 S.Ct. 2946). The "just share of state tax burden" includes sharing in the cost of providing "police and fire

protection, the benefit of a trained work force, and 'the advantages of a civilized society.'" *Commonwealth Edison*, 453 U.S. at 624, 101 S.Ct. 2946 (quoting *Exxon Corporation v. Wisconsin Department of Revenue*, 447 U.S. 207, 228, 100 S.Ct. 2109, 65 L.Ed.2d 66 (1980) and *Japan Line, Ltd. v. Los Angeles*, 441 U.S. 434, 445, 99 S.Ct. 1813, 60 L.Ed.2d 336 (1979)). *See Wisconsin v. J.C. Penney Company*, 311 U.S. 435, 444, 61 S.Ct. 246, 85 L.Ed. 267 (1940) (the exercise of a state's tax power over a taxpayer's activities is justified by "protection, opportunities and benefits" the state confers upon those activities.).

As a privilege of doing business within Philadelphia, Eagles, Inc. enjoys police and fire protection, along with the advantages conferred by the city's maintenance of a civilized society. As stated above, these are justifications enough for the imposition of a tax.[21] *See Goldberg; Commonwealth Edison*. We, therefore, conclude that the measure of tax is reasonably related to the taxpayer's presence and activities within Philadelphia.

Accordingly, we conclude that Philadelphia's tax assessment of 100% of Eagles, Inc.'s media receipt was not in violation of the Commerce Clause.

## II. *DEDUCTIBILITY OF AIRPLANE EXPENSES*

Eagles, Inc. contends that the Tax Board erred in failing to deduct all the airplane expenses in computing the BPT on net income under Method I. We disagree.

In reporting net income for purposes of the BPT, the Philadelphia Code permits the taxpayer to report the net income in one of two methods: either as a Method I filer, using net income reported on the taxpayer's financial income statement, or

---

21. Additionally, Eagles, Inc. will also benefit from city and state tax dollars in the financing of a new stadium. The Commonwealth of Pennsylvania, through the recently enacted Capital Facilities Debt Enabling Act, Act 1 of February 9, 1999, P.L. 1, will provide $320 million in state subsidies to help build new stadiums for the Eagles Team, Philadelphia Phillies, Pittsburgh Pirates, and Pittsburgh Steelers.

as a Method II filer, using net income reported on the taxpayer's federal income tax return. Section 19–2601 of the Philadelphia Code.

Under Method I, also known as the books and records method, "net income" is:

> The net gain from the operation of a business, after provision for all *allowable costs and expenses actually incurred in the conduct thereof,* either paid or accrued in accordance with the accounting system used, without deduction of taxes based on income.

Section 19–2601 of the Philadelphia Code (emphasis added). Similarly, the BPT Regulations limit the prohibited deductions to deductions for income taxes and deductions for fines and penalties, providing:

> Method I net income shall be the net gain from the operation of a business, profession or other activity after provision for all allowable expenses actually incurred in the conduct thereof, either paid or accrued in accordance with the accounting system used, without deduction of taxes based on income, and without deduction of fines and penalties and

**22.** The adjustments include:

(i) A deduction for dividends, interest and royalty income and other receipts excluded from the definition of receipts under paragraphs (5) and (7) of that definition, but only to the extent that such dividends, interest, royalty and other receipts are included in taxable income as returned to and ascertained by the Federal Government as heretofore defined.

(ii) A deduction for net income attributable to receipts that are excluded under paragraph (6) or (9) of the definition of "receipts" of this section.

(iii) A deduction for income received from all obligations of the United States, including stocks, bonds and Treasury notes and other obligations of the United States.

(iv) An increase for interest expense attributable to these stocks, bonds and Treasury notes and other obligations of the United States or any of its political subdivisions which is exempt from taxation of income under the laws of the United States or of the Commonwealth. The increase shall not

as allocated and apportioned as provided in this article.

Section 403 of the BPT Regulations.

Under Method II, also known as the federal tax method, "net income" is the "taxable income from any business activity as returned to and ascertained by the Federal Government prior to giving effect to the exclusion for dividends received and net operating loss" subject to certain adjustments.[22] Section 19–2601 of the Philadelphia Code. *See* Section 404(1)(a) of the BPT Regulations. Method II permits deductions from income only for those expenses that are "ordinary and necessary" expenses of the business under the Internal Revenue Code.[23]

In the instant case, Eagles, Inc. irrevocably[24] elected to compute net income under Method I. Eagles, Inc. used GAAP as its method of accounting for financial income purposes. In calculating its BPT liability, Eagles, Inc. used the net income it reported on its certified financial statement prepared in accordance with GAAP. In arriving at the net income calculation, Eagles, Inc. deducted 100% of the operating expenses and depreciation of the airplane.

exceed the deduction claimed in subparagraph (iii).

(v) A deduction for net income of persons registered under the Pennsylvania Securities Act of 1972 other than the net income attributable to commissions and similar charges on account of transactions effected for persons residing or having their principal place of business within a city of the first class.

Section 19–2601 of the Philadelphia Code.

**23.** Section 162(a) of the Internal Revenue Code provides that in order to qualify as an "allowable" deduction an item must (1) be paid or incurred during the taxable year, (2) be for carrying on any trade or business, (3) be an expense, (4) be a necessary expense, and (5) be an ordinary expense.

**24.** Section 19–2601 of the Philadelphia Code provides that the option shall not be revocable. ("Net income shall, at the option of the taxpayer, which option shall not be revokable [sic] by the taxpayer after it has been exercised as provided for by the collector....").

Both Eagles, Inc. and Philadelphia agree that the operation of an airplane was a proper business expense. However, the parties disagree over what percentage of the airplane's operating costs are tax deductible. While the Tax Board found that the purchase of the airplane was a necessary business expense, the Tax Board found that not all use of the airplane constituted a necessary business expense. Based upon the airplane use log for 1991, the Tax Board found that only 28.86% was used for "Eagles Business" and attributed the remaining 71.14% to personal use, commuting, vacation and charter use.[25] Tax Board Decision, pp. 6–7. The Tax Board determined that vacation, medical and charter flights were not related to Eagles business activities. The Tax Board concluded, and the trial court agreed, that only expenses and depreciation attributable to valid business related expense for purposes of the BPT could be deducted and that deductions for non-business related flights were disallowed.

Eagles, Inc. contends that the accounting method controls the appropriateness of the deduction. Under the GAAP method of accounting, 100% of the airplane expenses were deductible. Eagles, Inc. maintains that for purposes of determining the amount of airplane expenses deductible in calculating the BPT on net income, the fixed expenses Eagles, Inc. incurred in the operation of its airplane should be deducted in their entirety, since Eagles, Inc. necessarily incurred them regardless of the deductibility of the variable expense. In short, Eagles, Inc. argues that so long as the deductions conform to the taxpayer's accounting system and are incurred in the operation of the business, and are not income taxes or fines and penalties, the deductions are proper for BPT purposes.

■ Deductibility for standard accounting purposes as a legitimate business expense, however, does not necessarily equate to deductibility for tax purposes. Just as fines and penalties may be allowable expenses under GAAP, such expenses are not permissible deductions for BPT purposes. Section 403 of the BPT Regulations. While Eagles, Inc. attempts to persuade that the only limits that the BPT places on deductions, with the exception of income taxes and fines and penalties, is that they are "actually incurred in the conduct" of the business and "in accordance with the accounting system used," Eagles, Inc. ignores the language which provides only *"allowable costs and expenses"* are deductible for purposes of the BPT. The inclusion of the word "allowable" to describe costs and expenses incurred in the conduct of operating a business makes it clear that only business related expenses are allowable deductions for Method I filers under the BPT. Regardless of which method a taxpayer chooses to use, an expense must be business related in order to be an "allowable" deduction under BPT. Therefore, expenses which are not related to business are not deductible for purposes of calculating net income under BPT.

■ Since the airplane was only used 28.86% of the time for Eagles' business, only expenses and depreciation attributable to these flights is deductible for purposes of determining net income under the BPT. We, therefore, conclude that the Tax Board properly disallowed a deduction from net income for the non-business related expenditures related to vacation, medical and charter flights.

### III. *WAGE TAXES*

Both Eagles, Inc. and Philadelphia contend that the Tax Board's finding that Mr. Braman spent 30.5% of his time in Philadelphia in 1991 for Wage Tax purposes not supported by substantial evidence. Eagles, Inc. maintains that the correct percentage is 23.31%, while Philadelphia maintains that 40% is correct.

---

**25.** Specifically, the Tax Board found "Eagles business at 28.86%, personal use of Mr. Braman at 2.64%, commuting to and from Flori- da for Mr. Braman at 31.78%, vacation used for Mr. Braman at 15.25%, and charter use at 21.27%." Tax Board Decision p. 3.

Section 19–1500 of the Philadelphia Code pertains to Wage and Net Profits Tax. Of relevance to our discussion is Section 19–1502(1)(b) of the Philadelphia Code, which provides that the "salaries, wages, commissions and other compensation earned by non-residents of Philadelphia for work done or services performed or rendered in Philadelphia" is subject to the Wage Tax. This tax pertains to and is imposed upon salaries, wages, commissions, and other compensation paid by an employer or on his behalf to any person who is employed by or renders services to him. Section 19–1502(2) of the Philadelphia Code. A non-resident is defined as an "individual, co-partnership, association, corporation or any other entity domiciled outside the City." Section 19–1501 of the Philadelphia Code.

In the case before us, Mr. Braman was a non-resident of Philadelphia for the tax year in question, 1991. In that year, Mr. Braman received an annual salary of $5 million from Eagles, Inc. On the 1991 tax return, Eagles, Inc. claimed 75% of Mr. Braman's salary as an exclusion on the basis that Mr. Braman only spent 25% of his time in Philadelphia. During the audit, however, Eagles, Inc. presented no records to substantiate the amount of time Mr. Braman worked in Philadelphia. The auditor assessed the tax at 40%, which was the amount of time Mr. Braman had spent in Philadelphia in the five previous tax years.

Eagles, Inc. challenged the auditor's assessment. In an effort to compute the number of days Mr. Braman worked in Philadelphia for the tax year in question, Mr. Braman and his accountant reviewed Mr. Braman's diaries, airplane, hotel and other travel documents. From this information, Eagles, Inc. submitted to the Tax Board four summarized time sheets covering Mr. Braman's whereabouts during 1991.

The Tax Board, in reviewing these time sheets noted that the sheets were prepared several years after the tax year in question in preparation of the tax proceedings. The Tax Board further noted that these materials were not made available at the audit and could not be reviewed by the auditor in making his initial assessment for 1991. Based upon Mr. Braman's testimony, the Tax Board found the sheets to be "estimations of [Mr. Braman's] activities with some inaccuracies and conflicting information." Tax Board Decision p. 4.

The burden of proof to refute the presumptive validity of the assessment rests with the Taxpayer. Although the four summaries presented by Eagles, Inc. show that the percentages of time Mr. Braman spent in Philadelphia fluctuated between 21.27% and 25%, the Tax Board did not find the summaries to be wholly reliable to substantiate the taxpayer filing of 25%. The Tax Board also did not rely upon Philadelphia's assertion that Mr. Braman spent 40% of his time in Philadelphia, which was based upon the percentage used on previous returns. Instead, the Tax Board, acting as fact finder, chose to make its own calculation by adding up the total days from each of the four exhibits that Mr. Braman admitted to being in Philadelphia. Ultimately, the Tax Board determined that Mr. Braman was in Philadelphia for 61 days out of 200 workings days in 1991, or 30.5% of the time. Based upon our review of the record, we conclude that the Tax Board's calculation that Mr. Braman spent 30.5% of his time working in Philadelphia is supported by substantial evidence and does not constitute an abuse of discretion.

The Tax Board also ruled that Mr. Braman's use of the airplane for non-Eagles business is to be treated as non-cash compensation to Mr. Braman subject to the Wage Tax and should be treated as deductible compensation expenses by Eagles, Inc. To this extent, Philadelphia contends that the Tax Board erred. We disagree.

The Wage Tax defines *"Salaries, Wages, Commissions and Other Compensation"*

to include "[a]ll salaries, wages, commissions, bonuses, incentive payments, fees and tips that may accrue or be received by an individual, whether indirectly or through an agent and whether in cash or in property, for services rendered," with certain exclusions. Section 19–1501(8) of the Philadelphia Code. For purposes of calculating net income, such compensation constitutes a business deduction for an employer. *See* Section 408(2) of the BPT Regulations.

Clearly, Mr. Braman's use of Eagles, Inc.'s airplane for vacation, medical, commuting and other personal use constitutes "other compensation." Therefore, the costs and depreciation associated with these flights should be included within Mr. Braman's income for purposes of the Wage Tax and subject to the 30.5% apportionment. *See, e.g., Rodgers Dairy Company v. Commissioner of Internal Revenue*, 14 T.C. 66, 1950 WL 117 (U.S. Tax Ct.1950). To the extent that the airplane was used for charter flights, only the difference between the standard value of the charter flights and the amount of reimbursement made to Eagles, Inc. by Mr. Braman for the flights would qualify as "other compensation." As Eagles, Inc. is entitled to a business deduction for the amount of all compensation paid to an employee, Eagles, Inc. is entitled to a deduction for the value of Mr. Braman's non-business use of the airplane. We, therefore, conclude that the Tax Board's reclassification of the non-business flights as additional or "other compensation" for Mr. Braman and an allowable deduction for Eagles, Inc. was proper.

## IV. *INTEREST AND PENALTY*

Eagles, Inc. contends that the Tax Board erroneously refused to abate interest and penalties on the grounds that Eagles, Inc. should have known that it could not deduct 100% of its airplane expenses

when Eagles, Inc. was only using the Airplane for business 28.86% of the time and Mr. Braman failed to provide the auditor with time logs and calculations of Mr. Braman's time spent in Philadelphia as a reason for denial. We disagree.

With regard to penalties, the Philadelphia Code provides that "In addition to these penalties or enforcement proceedings provided for in Chapter 19–500 of this Title this Chapter may also be enforced in accordance with other penalties provided for in the Act known as the First Class City Business Tax Reform Act." Section 19–2608 of the Philadelphia Code. Section 19–509(2) of the Philadelphia Code provides:

Commencing on July 1, 1987, if any tax authorized or imposed under this Title was not paid when due or is not paid when it becomes due, there shall be added to the amount of the unpaid tax, interest, and penalty and collected therewith...

Section 19–509 further provides for costs together with interest and penalties.[26]

While the levying of penalties and interest is mandatory under the Philadelphia Code, the abatement or waiver of such penalties and interest is purely discretionary where the Tax Board finds that a taxpayer acted in good faith, without negligence and no intent to defraud. Section 19–1705 of the Philadelphia Code. Pursuant to Section 19–1705 of the Philadelphia Code, a taxpayer can file a Petition for Waiver of Interest and Penalties. "Upon the filing of any petition for the waiver of interest and penalties accruing upon any unpaid money or claim collectible by the Department of Revenue, for or on behalf of the City or the School District of Philadelphia, the Tax Review Board *may abate in whole or in part interest or penalties, or both, where in the opinion of the Board the petitioner acted in good faith, without negligence and no intent to defraud.*"

---

**26.** Section 19–509(3) provides "Where suit is brought for the recovery of any such tax the person liable therefor shall, in addition, be liable for the costs of collection together with the interest and penalties herein imposed."

Section 19–1705(2) of the Philadelphia Code (emphasis added).

The determination to abate interest or penalties is within the sound discretion of the Tax Board. Absent an abuse of that discretion, a reviewing court should not disturb a local agency's ruling. *Mulberry Market v. Philadelphia*, 735 A.2d 761 (Pa.Cmwlth.1999).

In the case before us, the Tax Board did not find that Eagles, Inc. acted in good faith, without negligence and no intent to defraud. Instead, the Tax Board found that Eagles, Inc. should have known that it was not reasonable to claim a 100% deduction for expenses associated with the airplane when over 70% of its use was for purposes other than its own business activities. The Tax Board further found that the Wage Tax issue could have been resolved at the audit had Eagles, Inc. and Mr. Braman provided the time logs and calculations of the time Mr. Braman spent in Philadelphia which were made available to the Tax Board. For these reasons, the Tax Board concluded that Eagles, Inc. was not entitled to an abatement or adjustment of interest or penalties. Based upon our review of the record and in light of our disposition of the case, we do not find that the Tax Board committed an abuse of discretion in this regard.

Accordingly, the order of the trial court is affirmed in accordance with the foregoing opinion.

### ORDER

AND NOW, this 26th day of July, 2000, the order of the Court of Common Pleas of Philadelphia, dated December 31, 1998, at Docket Nos. 9712–2250 and 9712–2353, is hereby affirmed in accordance with the foregoing opinion.

Judge McGINLEY recused.